## THE UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF KENTUCKY
## LOUISVILLE DIVISION

| | |
|---|---|
| KENNETH DUKES, MARK A. GALE, CHRISTINE CHAVIS, and DAVID R. FLY, individually, and as representatives of a class of Participants and Beneficiaries of the Amerisource-Bergen Corporation Employee Investment Plan, | Case No. 3:23-CV-313-DJH-CHL |
| Plaintiffs, | |
| v. | |
| AMERISOURCEBERGEN CORPORATION, BOARD OF DIRECTORS OF AMERISOURCEBERGEN CORPORATION, and AMERISOURCEBERGEN CORPORATION BENEFITS COMMITTEE, | |
| Defendants. | |

## DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' COMPLAINT AND MEMORANDUM OF LAW

**TABLE OF CONTENTS**

**Page**

INTRODUCTION ....................................................................................................................... 1

BACKGROUND ......................................................................................................................... 4

I.      The Plan ........................................................................................................................... 4

II.     The Plan's RKA Services and Fees ................................................................................. 4

III.    Plaintiffs' Claims ............................................................................................................. 6

LEGAL STANDARD ................................................................................................................. 6

ARGUMENT .............................................................................................................................. 7

I.      Plaintiffs' Excessive-RKA-Fee Claim in Count I Should Be Dismissed. ...................... 7

        A.      Plaintiffs' Fee Comparisons Do Not Support an Inference That AB Lacked a
                Prudent Fiduciary Process Because Their Comparator Plans Differ Widely in
                Participant Count and Asset Size and Because They Selectively Use a Single
                Plan Year as a Comparison, Ignoring That RKA Fees Vary Year-to-Year. ...................... 8

        B.      Plaintiffs' Fee Comparisons Fail Because They Do Not Account for Differing
                Types and Levels of Service Provided By Plan Recordkeepers. .................................... 11

        C.      Plaintiffs' Fee-Comparison Allegations Fail Because They Do Not Accurately
                Calculate the Total Fees Paid by the Comparator Plans. .............................................. 18

II.     Plaintiffs' Derivative Failure-to-Monitor Claim in Count II Should Be Dismissed ................... 21

CONCLUSION ......................................................................................................................... 22

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*16630 Southfield Ltd. P'ship v. Flagstar Bank, F.S.B.*,
    727 F.3d 502 (6th Cir. 2013) ........................................................................... 7

*Albert v. Oshkosh Corp.*,
    47 F.4th 570 (7th Cir. 2022) ..................................................................... 11, 12

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ................................................................................ 6, 7, 8

*Ashland, Inc. v. Oppenheimer & Co.*,
    648 F.3d 461 (6th Cir. 2011) ........................................................................... 4

*Bell Atlantic Corp. v. Twombly*,
    550 U.S. 544 (2007) ......................................................................................... 6

*England v. DENSO Int'l Am. Inc.*,
    2023 WL 4851878 (E.D. Mich. July 28, 2023) ...................................... *passim*

*Ferguson v. Ruane Cunniff & Goldfarb Inc.*,
    2019 WL 4466714 (S.D.N.Y. Sept. 18, 2019) ................................................. 8

*Fifth Third Bancorp v. Dudenhoeffer*,
    573 U.S. 409 (2014) ............................................................................ 2, 6, 7, 9

*Fritton v. Taylor Corp.*,
    2022 WL 17584416 (D. Minn. Dec. 12, 2022) .............................................. 17

*Goldenberg v. Indel, Inc.*,
    741 F. Supp. 2d 618 (D.N.J. 2010) ............................................................... 12

*Guyes v. Nestle USA, Inc.*,
    2022 WL 18106384 (E.D. Wis. Nov. 21, 2022) ............................................. 13

*Harmon v. FMC Corp.*,
    2018 WL 1366621 (E.D. Pa. Mar. 16, 2018) ................................................ 21

*Hecker v. Deere & Co.*,
    556 F.3d 575 (7th Cir. 2009) ........................................................................... 2

*Hi-Lex Controls, Inc. v. Blue Cross Blue Shield of Mich.*,
    751 F.3d 740 (6th Cir. 2014) ........................................................................... 4

*Hughes v. Nw. Univ.*,
    142 S. Ct. 737 (2022) ................................................................................... 2, 6

*Jones v. Dish Network Corp.*,
  2023 WL 2644081 (D. Colo. Mar. 27, 2023) ................................................................ 11

*Krutchen v. Ricoh USA, Inc.*,
  2022 WL 16950264 (E.D. Pa. Nov. 15, 2022) ............................................................... 13

*Laabs v. Faith Techs., Inc.*,
  2022 WL 17418358 (E.D. Wis. Nov. 9, 2022) ............................................................... 13

*Mateya v. Cook Grp. Inc.*,
  2023 WL 4608536 (S.D. Ind. June 16, 2023) ........................................................ *passim*

*Matney v. Barrick Gold of N. Am.*,
  2023 WL 5731996 (10th Cir. Sept. 6, 2023) ..................................................... 8, 12, 13

*Mator v. Wesco Distrib., Inc.*,
  2022 WL 3566108 (W.D. Pa. Aug. 18, 2022) ............................................................ 12, 13

*Matousek v. MidAmerican Energy Co.*,
  51 F.4th 274 (8th Cir. 2022) ....................................................................................... 11, 20

*Miller v. Packaging Corp. of Am.*,
  2023 WL 2705818 (W.D. Mich. Mar. 30, 2023) ................................................... *passim*

*Nicolas v. Trs. of Princeton Univ.*,
  2017 WL 4455897 (D.N.J. Sept. 25, 2017) ................................................................... 22

*Perkins v. United Surgical Partners Int'l Inc.*,
  2022 WL 824839 (N.D. Tex. Mar. 18, 2022) ............................................................... 12

*Pfeil v. State St. Bank & Tr. Co.*,
  806 F.3d 377 (6th Cir. 2015) ...................................................................................... 2, 7

*Probst v. Eli Lilly & Co.*,
  2023 WL 1782611 (S.D. Ind. Feb. 3, 2023) ................................................... 2, 3, 12, 15

*Riley v. Olin Corp.*,
  2022 WL 2208953 (E.D. Mo. June 21, 2022) ......................................................... 8, 12

*Romero v. Nokia, Inc.*,
  2013 WL 5692324 (N.D. Cal. Oct. 15, 2013) ............................................................... 22

*Saumer v. Cliffs Nat. Res. Inc.*,
  2016 WL 8668509 (N.D. Ohio Apr. 1, 2016) ............................................................... 21

*Sigetich v. The Kroger Co.*,
  2023 WL 2431667 (S.D. Ohio Mar. 9, 2023) ....................................................... *passim*

*Singh v. Deloitte LLP*,
  2023 WL 186679 (S.D.N.Y. Jan. 13, 2023) ............................................................ 12, 19

*Smith v. CommonSpirit Health*,
  2021 WL 4097052 (E.D. Ky. Sept. 8, 2021) ........................................................... 4, 8, 13

*Smith v. CommonSpirit Health*,
  37 F.4th 1160 (6th Cir. 2022) ................................................................................. *passim*

*PBGC ex rel. St. Vincent Cath. Med. Ctrs. Ret. Plan v. Morgan Stanley Inv. Mgmt. Inc.*,
  712 F.3d 705 (2d Cir. 2013) .............................................................................................. 7

*Wehner v. Genentech, Inc.*,
  2021 WL 507599 (N.D. Cal. Feb. 9, 2021) ..................................................................... 17

*White v. Chevron Corp.*,
  2016 WL 4502808 (N.D. Cal. Aug. 29, 2016) ................................................................ 12

*White v. Chevron Corp.*,
  752 F. App'x 453 (9th Cir. 2018) ...................................................................................... 7

*Young v. Gen. Motors Inv. Mgmt. Corp.*,
  325 F. App'x 31 (2d Cir. 2009) ....................................................................................... 11

**Statutes**

Employee Retirement Income Security Act of 1974 ("ERISA"),
  29 U.S.C. §§ 1001-1461 ....................................................................................... *passim*

**Rules**

Fed. R. Civ. P. 12(b)(6) .......................................................................................... *passim*

Defendants AmerisourceBergen Corporation, the Board of Directors of the AmerisourceBergen Corporation, and the AmerisourceBergen Benefits Committee (together, "Defendants," "AmerisourceBergen," or "AB"), respectfully move the Court to dismiss Plaintiffs' Complaint for failures to state a claim under Rule 12(b)(6).

## INTRODUCTION

This is the latest in a deluge of copycat class actions claiming fiduciaries of an employer's 401(k) retirement plan breached their "duty of prudence" under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001-1461. Plaintiffs are four current or former participants in the AmerisourceBergen Corporation ("AB") Employee Investment Plan ("Plan"). Unlike most other of these cases filed in recent years, Plaintiffs do not dispute that the Plan here offered a diverse menu of well-performing and low-priced investment options to help them save for retirement. Rather, Plaintiffs claim only that the Plan paid slightly more for recordkeeping and administrative ("RKA") services in 2018 than 17 other plans Plaintiffs plucked from publicly available "Form 5500" filings made by thousands of 401(k) plans each year. From there, Plaintiffs say the Court must *infer* that the AB defendants failed to employ a prudent process to ensure the Plan incurred reasonable RKA expenses in 2017-2023.

The Complaint should be dismissed. In the Sixth Circuit, a plaintiff cannot state a duty-of-prudence claim under ERISA by simply comparing the alleged expenses of one plan to those of other plans. *See Smith v. CommonSpirit Health*, 37 F.4th 1160, 1169 (6th Cir. 2022) (affirming Rule 12(b)(6) dismissal of recordkeeping claim). That is why other district courts in this Circuit (and across the country) have dismissed virtually identical RKA-fee claims brought by Plaintiffs' same counsel.[1] That result is appropriate here: As in the dismissed cases, Plaintiffs offer only

---

[1] *See, e.g., Sigetich v. The Kroger Co.*, 2023 WL 2431667 (S.D. Ohio Mar. 9, 2023); *Miller v. Packaging Corp. of Am.*, 2023 WL 2705818 (W.D. Mich. Mar. 30, 2023); *England v. DENSO Int'l Am. Inc.*, 2023 WL

conclusory allegations about the RKA services the Plan received, and claim that the Plan must have overpaid for those services because some "comparator" plans allegedly paid smaller amounts for the unspecified RKA services they received in 2018 alone.  As a matter of law, such allegations do not state a plausible claim for breach of the duty of prudence.

To start, the premise of Plaintiffs' claim—namely, that the Plan had higher RKA expenses than some other plans—is legally flawed.  "Nothing in ERISA requires every fiduciary to scour the market to find and offer the cheapest" services available.  *CommonSpirit*, 37 F.4th at 1169 (quoting *Hecker v. Deere & Co.*, 556 F.3d 575, 586 (7th Cir. 2009)).  Instead, ERISA's duty of prudence is rooted in process, not results.  *Pfeil v. State St. Bank & Tr. Co.*, 806 F.3d 377, 384 (6th Cir. 2015).  For that reason, the Supreme Court has emphasized that, even at the pleadings stage, district courts "must give due regard to the range of reasonable judgments a fiduciary may make," *Hughes v. Nw. Univ.*, 142 S. Ct. 737, 742 (2022), so that Rule 12(b)(6) remains an "important mechanism" for "weeding out meritless" claims against ERISA plan fiduciaries, *Fifth Third Bancorp v. Dudenhoeffer*, 573 U.S. 409, 425 (2014).  Here, the Complaint is devoid of allegations about AB's fiduciary process.  Nor does it plausibly allege that the Plan's RKA fees fell so far outside the "range of reasonable" fees a fiduciary could agree to pay that the Court must ***infer*** that AB's decision-making was imprudent.  There are thousands of ERISA plans in this country, so even if Plaintiffs could identify dozens that incurred lower RKA expenses, without more, it would not plausibly follow that the AB Plan paid too much for the specific RKA services it received— let alone that it failed to prudently evaluate those expenses.

This is confirmed by the Sixth Circuit's requirement that Plaintiffs must "allege that the

4851878 (E.D. Mich. July 28, 2023); *Probst v. Eli Lilly & Co.*, 2023 WL 1782611 (S.D. Ind. Feb. 3, 2023); *Mateya v. Cook Grp. Inc.*, 2023 WL 4608536 (S.D. Ind. June 16, 2023).

[RKA] fees were excessive *relative to the services rendered*." *CommonSpirit*, 37 F.4th at 1169 (emphasis added). The Complaint flunks that requirement by focusing only on certain RKA fees the comparator plans allegedly paid, without identifying the scope, volume, or quality of the RKA services they received—let alone how those services compared to those the AB Plan received. Instead, Plaintiffs try to skirt this requirement by alleging all recordkeepers provide the same RKA services to "mega" sized plans. Compl. ¶¶ 55-56, 60-61. But as courts have repeatedly held, such "wholly conclusory" allegations that *all recordkeepers* provide the same menu of services are not entitled to an assumption of truth, and regardless, cannot plausibly establish that *all large plans* select and receive the same services from whichever provider they choose. *Probst*, 2023 WL 1782611, at *10. To the contrary, Plaintiffs' own documents confirm that the AB Plan selected and received different RKA services than Plaintiffs' comparators, and that the comparator plans also differed among themselves with respect to the RKA services they elected to receive.

Finally, Plaintiffs' fee comparisons are meaningless (and misleading) for other reasons. For example, when calculating the AB Plan's total RKA fees, Plaintiffs include both "direct" and "indirect" fees, but when they calculate the comparator-plan fees they include only direct fees and ignore the indirect fees incurred. This has the effect of artificially discounting the comparator-plan fees relative to the AB Plan in the same way other courts have held precludes any meaningful comparison or plausible inference of fiduciary imprudence. Likewise, Plaintiffs include fees for "a la carte" and "ad hoc" services in computing the Plan's RKA fees, without accounting for how those participant-elected-service fees—incurred on a per-service basis—impact the average per-participant costs of their comparator plans. Finally, Plaintiffs make obvious mistakes in calculating some of their comparator-plan fees, further discounting them.

For all these reasons and as discussed further below, the Complaint should be dismissed.

3

# BACKGROUND[2]

## I.      The Plan

The Plan is a defined contribution plan under ERISA, 29 U.S.C. § 1002(34).  Compl. ¶ 2.
AB sponsors the Plan and appoints the Benefits Committee ("Committee") members who manage
the Plan.  *Id.*  ¶¶ 3-4, 45, 129-31.  The Plan offers a diverse menu of well-performing, low-cost
investment options, which allows participants to choose for themselves how to invest and save for
retirement on a tax-deferred basis.  Compl. ¶¶ 1-3; *see also* Ex. A, Excerpts of 2018 AB Plan Form
5500, at 15.  Plaintiffs have no complaint about the investment menu.

The money participants invest in the Plan comes from their own voluntary contributions,
as well as employer matching contributions.  In 2018, for instance, AB made more than $30 million
in employer matching contributions to participant accounts.[3]  Meanwhile, more than 20,000
current and former AB employees have participated in the Plan, and the Plan's total assets have
increased from $1.1 billion to $1.9 billion.  Compl. ¶ 93.[4]

## II.     The Plan's RKA Services and Fees

The Plan engages Fidelity Investments ("Fidelity"), a "national retirement plan services
provider," to provide certain recordkeeping and administrative, or "RKA," services to the Plan.
Compl. ¶¶ 6, 49.  As the U.S. Department of Labor ("DOL") explains, RKA services can include

---

[2] This section includes factual background based on the Complaint's allegations and the publicly available
"Form 5500" documents and other Plan documents referenced therein, which the Court may properly
consider at the pleadings stage.  *See, e.g.*, *Ashland, Inc. v. Oppenheimer & Co.*, 648 F.3d 461, 467 (6th Cir.
2011) (considering documents referenced in support of allegations in complaint); *Hi-Lex Controls, Inc. v.
Blue Cross Blue Shield of Mich.*, 751 F.3d 740, 746 n.8 (6th Cir. 2014) (considering Forms 5500 because
they are publicly available governmental filings); *Smith v. CommonSpirit Health*, 2021 WL 4097052, at *9
(E.D. Ky. Sept. 8, 2021), *aff'd*, 37 F.4th 1160 (6th Cir. 2022) (considering ERISA plan fee disclosures).

[3] Ex. A, Excerpts of 2018 AB Plan Form 5500, at 14.

[4] *See* Ex. B, Excerpts of 2017 AB Plan Form 5500, at 16; Ex. C, Excerpts of 2021 AB Plan Form 5500, at
19.

both (1) basic services necessary to the daily operation of the plan, such as "recordkeeping, accounting, legal and trustee services," and (2) "a host of additional services, such as telephone voice response systems, access to customer service representative[s], educational seminars, retirement planning software, investment advice, electronic access to plan information, daily valuation, and online transactions," among other services.[5]

The Complaint divides the RKA services Fidelity offers into three categories. First, the Complaint alleges Fidelity offers "bundled" services, including recordkeeping, transaction processing, administrative services, participant communications, tracking account balances, overseeing investment elections, processing transactions, and customer service support. Compl. ¶¶ 49-53. Second, the Complaint alleges that Fidelity offers various "a la carte" services that individual participants can elect to receive for additional fees, including, among others, individual loan processing, brokerage-account services, benefit-distribution services, and qualified-domestic-relations-order ("QDRO") services. *Id.* ¶¶ 62-63. Third, the Complaint alleges Fidelity offers other "ad hoc" services, which carry their own unique fees. *Id.* ¶ 64.

According to the Complaint, the Plan paid fixed fees for "bundled" RKA services of $48 per participant in 2017-21, $42 per participant in 2022, and $36 per participant in 2023. Compl. ¶ 57.[6] In addition, relying on data in the Plan's annual Form 5500 filings, the Complaint estimates that the Plan paid, on average, $12.50 per participant for the "a la carte" and "ad hoc" services participants individually elected to receive. *Id.* ¶ 66. Despite these allegations, which would

---

[5] *See* DOL, Understanding Retirement Plan Fees and Expenses at 2 (Sept. 2021), available at https://www.dol.gov/sites/dolgov/files/ebsa/about-ebsa/our-activities/resource-center/publications/understanding-retirement-plan-fees-and-expenses.pdf (last visited Sept. 15, 2023).

[6] The Plan's fixed recordkeeping fees of $48 and $36 per participant in 2017-2022 were disclosed to participants in annual Section 404a-5 disclosures, referenced in the Complaint ¶ 93, along with the variable fees charged for other elective services participants could select. *See* Ex. D, Excerpt of 2022 AB Plan Participant Disclosure Notice, at 4-5.

5

suggest combined fees ranging from $60.50 per participant in 2017 to $48.50 per participant in 2023, the Complaint later presents a chart "estimating" that the Plan's fees ranged from $59 to $63, on average, per participant since 2017. *Id.* ¶ 93.  Plaintiffs' estimated range does not include 2023 data and assumes the Plan's fees in 2022 were the same as they were in 2021, despite the large reduction in "bundled services" alleged elsewhere in the Complaint.  *Id.* ¶ 57.

### III.  Plaintiffs' Claims

Plaintiffs bring two claims.  In Count I, they claim the Committee breached its fiduciary duty of prudence, 29 U.S.C § 1104(a)(1)(B), by failing to prudently monitor and obtain reasonable fees for the RKA services Fidelity provided to the Plan since 2017.  Compl. ¶¶ 128-38.  In Count II, Plaintiffs claim AB and its Board of Directors failed to adequately monitor the Committee and, thus, failed to determine that the Committee had not prudently incurred and monitored the Plan's RKA expenses.  *Id.* ¶¶ 140-45.

### LEGAL STANDARD

In assessing ERISA claims of fiduciary breach under Rule 12(b)(6), courts must apply the pleading standards described in *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), and *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), evaluating a complaint's allegations "as a whole" and "giv[ing] due regard to the range of reasonable judgments a fiduciary may make based on her experience and expertise."  *Hughes*, 142 S. Ct. at 742.  "Because the content of the duty of prudence turns on 'the circumstances . . . prevailing' at the time the fiduciary acts," courts must undertake a "careful, context-sensitive scrutiny of a complaint's allegations," free from hindsight, to "divide the plausible sheep from the meritless goats."  *Id.*; *Dudenhoeffer*, 573 U.S. at 425.

Under this analysis, when there are "two possible explanations, only one of which can be true and only one of which results in liability, [a] plaintiff [] cannot offer allegations that are 'merely consistent with' [its] favored explanation but are also consistent with [an] alternative

explanation." *White v. Chevron Corp.*, 752 F. App'x 453, 454 (9th Cir. 2018) (citation omitted); *see also Iqbal*, 556 U.S. at 678-79, 682 ("[A] complaint [that] pleads facts that are 'merely consistent with' a defendant's liability" fails to state a claim). The plausibility of an alleged inference "depends on a host of considerations, including common sense and the strength of competing explanations for the defendant's conduct." *16630 Southfield Ltd. P'ship v. Flagstar Bank, F.S.B.*, 727 F.3d 502, 504 (6th Cir. 2013).

As the Supreme Court has emphasized, Rule 12(b)(6) is an "important mechanism for weeding out meritless claims" in the ERISA context, especially. *Dudenhoeffer*, 573 U.S. at 425. This is due to the process-based standard ERISA requires and because "the prospect of discovery" in ERISA class actions is "ominous" and "elevates the possibility that a plaintiff with a largely groundless claim will simply take up the time of a number of other people, with the right to do so representing an in terrorem increment of the settlement value." *PBGC ex rel. St. Vincent Cath. Med. Ctrs. Ret. Plan v. Morgan Stanley Inv. Mgmt. Inc.* ("*St. Vincent*"), 712 F.3d 705, 718-19 (2d Cir. 2013) (citation omitted).

## ARGUMENT

### I.   Plaintiffs' Excessive-RKA-Fee Claim in Count I Should Be Dismissed.

To state a claim, Plaintiffs must allege facts plausibly showing that the Committee failed to act "with the care, skill, prudence, and diligence under the circumstances then prevailing" that a prudent person would use. 29 U.S.C. § 1104(a)(1)(B). This "prudent person" test focuses on the fiduciary's *process* in arriving at a decision, not the *results* of the decision. *Pfeil*, 806 F.3d at 384-85. Thus, Plaintiffs must either allege facts directly challenging the Committee's process, or from which the Court can reasonably *infer* that the process was imprudent. *See, e.g.*, *St. Vincent*, 712 F.3d at 718-19 ("[A]llegations must give rise to a '*reasonable* inference' that the defendant

7

committed the alleged misconduct . . . thus "permit[ting] the court to infer more than the *mere possibility* of misconduct[.]" (quoting *Iqbal*, 556 U.S. at 679)).

Here, Plaintiffs take the latter approach. Specifically, they allege that because the Plan's RKA expenses were purportedly larger than those of 17 other plans in 2018, the Court must infer that the Committee's process for determining the reasonableness of those fees since 2017 was imprudent. *See* Compl. ¶¶ 89-114.[7] Plaintiffs are wrong, as explained below.

> **A.    Plaintiffs' Fee Comparisons Do Not Support an Inference That AB Lacked a Prudent Fiduciary Process Because Their Comparator Plans Differ Widely in Participant Count and Asset Size and Because They Selectively Use a Single Plan Year as a Comparison, Ignoring That RKA Fees Vary Year-to-Year.**

Even taken at face value, Plaintiffs' single-year fee comparisons cannot support a reasonable inference that the Committee acted imprudently over a six-plus year period. There are thousands of plans in the marketplace, so an allegation that the Plan paid more than 17 others in 2018 says nothing about the reasonableness of the fees paid for the particular services the Plan received, let alone the process the Committee used to evaluate them. Indeed, an enterprising

---

[7] Plaintiffs' conclusory allegation that Defendants did not "solicit quotes and/or competitive bids from recordkeepers" (Compl. ¶ 91) is irrelevant to whether they have stated a plausible claim of imprudence. As another district court in the Sixth Circuit recently put it, "ERISA does not require plan fiduciaries to obtain competitive bids from plan service providers." *Miller*, 2023 WL 2705818, at *7 (quoting *Ferguson v. Ruane Cunniff & Goldfarb Inc*., 2019 WL 4466714, at *8 (S.D.N.Y. Sept. 18, 2019)); *see also Matney v. Barrick Gold of N. Am.*, 2023 WL 5731996, at *14 (10th Cir. Sept. 6, 2023) ("Simply alleging the [defendant] needed to conduct regular RFPs does not raise a plausible inference of imprudence"). As the *Miller* court explained, "[t]here are many ways that a plan fiduciary might find a reasonable rate for RKA services, just as there are many reasons why a fiduciary might reasonably conclude that it is more prudent to keep a known provider than transition to a new one at a lower price." *Miller*, 2023 WL 2705818, at *7. Thus, "assertions that the investment committee failed to conduct periodic requests for proposal and to renegotiate [RKA fees] . . . do not cause the court to draw an inference that the investment committee acted imprudently." *Id.* (quoting *Riley v. Olin Corp.*, 2022 WL 2208953, at *5 (E.D. Mo. June 21, 2022)). Further, "[b]ecause Plaintiff[s have] failed to allege facts plausibly showing that the recordkeeping fees paid were excessive, it makes no difference that [they] allege[] Defendants engaged in no examination, comparison, or benchmarking of the Plan's recordkeeping fees." *CommonSpirit*, 2021 WL 4097052, at *12. That is especially true here, where the Complaint alleges the annual fees for bundled RKA services *decreased* over time from $48 per participant to $36 per participant (Compl. ¶ 57). *See Matney*, 2023 WL 5731996, at *14 (allegations "showing the [p]lan's recordkeeping fees became cheaper over time" undermined any inference of imprudence related to alleged lack of an RFP).

plaintiff lawyer could challenge the fees paid by almost any 401(k) plan by scouring the market and Form 5500 filings to identify others that apparently paid less at some point.  That is why Rule 12(b)(6) is such an "important mechanism" for "weeding out" meritless ERISA claims, which seek to make ERISA fiduciaries an easy target for class-action litigation and outsized settlements.  *See Dudenhoeffer*, 573 U.S. at 425; *CommonSpirit*, 37 F.4th at 1164-65 (recognizing "the circumstances facing an ERISA fiduciary will implicate difficult tradeoffs, and courts must give due regard to the range of reasonable judgments" at the pleadings stage) (citation omitted).

Plaintiffs' comparators are particularly uninformative here because they vary dramatically in asset-size and participant-count relative to both the AB Plan and even among themselves.  In 2018, the AB Plan had 21,650 participants and $1.27 billion in assets.  Compl. ¶ 93.  Meanwhile, the comparators include plans ranging from 10,770 to 40,596 participants, and total assets of $321 million to $10.7 billion.  *Id.* ¶ 94.  As courts in this Circuit have found, such large discrepancies foreclose meaningful comparison.  *See DENSO*, 2023 WL 4851878, at *4 (dismissing claims where "the comparator plans vary greatly in terms of the number of participants and the amount of assets held"); *Miller*, 2023 WL 2705818, at *6 (same where the "comparators varied greatly in terms of the number of participants and the amount of assets held" because such discrepancies raise "serious doubt as to the plausibility of how the purported comparator plans are indeed comparable") (citation omitted); *Sigetich*, 2023 WL 2431667, at *10 (same because the "differences in [plan] size call[ed] into question [p]laintiff's comparable plans and whether the [defendant's plan's] recordkeeping fees were excessive relative [to] the services rendered").

Plaintiffs try to avoid this logic by claiming larger plans have more "bargaining power" and will, therefore, always pay lower RKA fees than smaller plans.  Compl. ¶¶ 6, 46, 134.  But their own comparators undermine that assertion.  For example, two comparator plans that allegedly

paid among the *lowest* alleged fees in 2018—the JBS 401(k) Savings Plan ($25 per participant) and the Pilgrim's Pride Plan ($26 per participant)—had much lower total assets (under $375 million) than the other comparators. *See id.* ¶ 94. Meanwhile, the largest comparator plan—The Dow Chemical Plan, with $10.7 billion in assets—had among the *highest* alleged per-participant fees ($33). Thus, as in other cases in which such claims were dismissed, "there is no observable trend from the information pled that larger plans pay less in [RKA] fees than smaller plans." *Mateya*, 2023 WL 4608536, at *6.

The meaningless nature of Plaintiffs' fee comparisons is underscored by Plaintiffs' choice to use comparative data for a single year (2018). Compl. ¶ 94. Not only are there no allegations showing that the comparator plans' fees remained constant or declined during the class period, but public records suggest the opposite. Take the Kindred 401(k) Plan for instance. The Complaint alleges that it paid direct RKA fees of $31 per participant in 2018, by dividing the direct fees paid to the plan's recordkeeper (T. Rowe Price) by the total number of plan participants. *Id.* However, more-recent data suggests the plan's direct RKA fees were ***$62*** per participant in 2021—without even accounting for the additional indirect fees the Kindred plan reportedly paid.[8] *See infra* at 18-20). Similarly, the Complaint relies on the Forms 5500 for the Fortive plan and the Dow Chemical plan to conclude that they paid direct fees in 2018 of $35 and $33, respectively, Compl. ¶ 94, but those same filings in other years show the Fortive plan paid ***$73*** per participant in 2020

---

[8] The $62 per-participant amount is calculated by dividing only the direct fees ($1,253,970) paid to the plan's recordkeeper by the total number of participants with active accounts (20,102), as reported in the plan's Form 5500. *See* Ex. E, 2021 Form 5500 for the Kindred 401(k) Plan, at 3 (total participants), 7 (direct fees). This same exercise indicates that other alleged comparator plans paid substantially higher direct fees in other years not included in the Complaint, but we have limited the illustration to the Kindred 401(k) Plan, the Fortive Retirement Savings Plan, and the Dow Chemical Company Employees' Savings Plan in the interests of brevity.

and the Dow Chemical plan paid *$71* per participant in 2017.[9]  Given the potential for large

variations in direct RKA fees (and indirect fees) from year to year, courts have found that selective,

single-year comparisons of this kind are insufficient to state a plausible claim, particularly one that

extends over a multi-year period.[10]  For good reason:  A single year of incomplete fee data from a

statistically insignificant set of "comparators," without more, cannot support any reasonable

inference that a plan's fiduciaries failed to prudently evaluate RKA fees over the course of more

than six years.  *See Mateya*, 2023 WL 4608536, at *8 (noting "prices change year-to-year, so costs

in one year are not necessarily comparable to costs in another").

> **B.     Plaintiffs' Fee Comparisons Fail Because They Do Not Account for Differing Types and Levels of Service Provided By Plan Recordkeepers.**

Plaintiffs' claim fails because the plans listed by Plaintiffs are not comparable, as they

provide varying levels and types of services to their participants, at variable costs.  To state a claim,

the Sixth Circuit, like other circuits, requires Plaintiffs to plausibly allege that the RKA services

the Plan received "are equivalent to those provided" to Plaintiffs' alleged comparator plans.

*CommonSpirit*, 37 F.4th at 1169 (quoting *Young v. Gen. Motors Inv. Mgmt. Corp.*, 325 F. App'x

31, 33 (2d Cir. 2009)) ("Plaintiffs fail to allege that the fees were excessive relative to the services

rendered."); *Matousek v. MidAmerican Energy Co.*, 51 F.4th 274, 279-80 (8th Cir. 2022) (plaintiff

must "identify similar plans offering the same services for less"); *Albert v. Oshkosh Corp.*, 47

F.4th 570, 579 (7th Cir. 2022) (affirming dismissal because complaint was "devoid of allegations

---

[9] The $73 and $71 per-participant amounts are calculated in the same way described, supra n.8.  *See* Ex. F, 2020 Form 5500 for the Fortive Retirement Savings Plan, at 3 (8,428 participants with account balances), 7 (direct fees of $621,322 paid to plan recordkeeper); Ex. G, 2017 Form 5500 for Dow Chem. Co. Emp. Savings Plan, at 3 (41,475 participants with account balances), 8 (direct fees of $2,966,853 paid to plan recordkeeper).

[10] *See, e.g., DENSO*, 2023 WL 4851878, at *4 n.7 (rejecting fee comparisons based on a "single year" of comparative data); *Mateya*, 2023 WL 4608536, at *8 (same); *Jones v. Dish Network Corp.*, 2023 WL 2644081, at *5 (D. Colo. Mar. 27, 2023) (same).

as to the quality or type of [RKA] services the comparator plans provided"); *Matney*, 2023 WL 5731996, at *15 (affirming dismissal where plaintiff "fail[ed] to offer factual allegations about the services provided either by" the challenged plan or the proposed comparators).[11]  Without such allegations, a complaint "does not provide the kind of context that could move [the] claim from possibility to plausibility."  *Oshkosh*, 47 F.4th at 580.

Here, the Complaint alleges nothing of the kind.  Instead, it alleges only that "RKA services are commoditized" and "essentially fungible," so the services available to all large retirement plans are "materially identical."  Compl. ¶¶ 60-61, 82, 92, 95-96, 102.  However, alleging that all recordkeepers *can* provide the same services is a far cry from alleging that each of Plaintiffs' comparator plans actually *selected and received* the same services as the AB Plan.  *See Mateya*, 2023 WL 4608536, at *4 ("While recordkeepers may *offer* the same services to all plans, that does not mean every plan *purchases* those services."); *Singh v. Deloitte LLP*, 2023 WL 186679, at *5 (S.D.N.Y. Jan. 13, 2023) ("[T]he plaintiffs' allegation that all recordkeepers offer the same range of services does not mean that all plans employing a particular recordkeeper receive an identical subset of services within that range."); *Probst*, 2023 WL 1782611, at *10 (holding that "alleg[ations] that all mega plans receive nearly identical recordkeeping services and that any

---

[11] District courts also routinely reject allegations that only compare prices, without a meaningful description of the services provided, between the challenged plan and the complaint's comparators.  *See, e.g., Mateya*, 2023 WL 4608536, at * 3 (collecting cases); *Riley*, 2022 WL 2208953, at *4 ("[P]laintiff must plead that the administrative fees are excessive in relation to the specific services the recordkeeper provided to the specific plan at issue.") (internal quotation marks and citation omitted); *Mator v. Wesco Distrib., Inc.*, 2022 WL 3566108, at *7 (W.D. Pa. Aug. 18, 2022), *appeal filed*, No. 22-2552 (3d Cir. Aug. 23, 2022) (same); *Perkins v. United Surgical Partners Int'l Inc.*, 2022 WL 824839, at *6 (N.D. Tex. Mar. 18, 2022) (same); *White v. Chevron Corp.*, 2016 WL 4502808, at *14 (N.D. Cal. Aug. 29, 2016) (dismissing complaint because plaintiffs did not "allege any facts from which one could infer that the same services were available for less on the market"); *Goldenberg v. Indel, Inc.*, 741 F. Supp. 2d 618, 631 (D.N.J. 2010) (dismissing excessive fees claim because "the [c]ourt ha[d] no way to gauge the reasonableness of the fee without knowing the cost of providers of the same service" and requiring plaintiff to allege "that similar services could be performed at substantially lower fees").

difference in services was immaterial to the price of those services" were "wholly conclusory and do nothing to identify what specific types of services comparator plans received relative to the Plan").[12]  In short, just because all of the plans order from the same menu does not mean that they were served the same meal.  Because that is all Plaintiffs have alleged here, there can be no reasonable inference that the AB Plan's fees were "excessive relative to the services rendered." *CommonSpirit*, 37 F. 4th at 1169.

Indeed, courts in the Sixth Circuit have repeatedly dismissed complaints containing Plaintiffs' same allegations that all "mega" plans receive the same "essentially fungible" RKA services.  In *Miller*, the court rejected the allegations because the complaint "provide[d] no facts to support [the plaintiff's] contention that the RKA services provided to mega plans are generally the same, or that the recordkeepers in his chart provided essentially the same services as [the challenged plan]."  2023 WL 2705818, at *5.  Likewise, in *DENSO*, the complaint did "not set forth facts to support the contention that the RKA services provided to mega plans are generally

---

[12] *See also, e.g.*, *Matney*, 2023 WL 5731996, at *15 (holding that "district court did not have to take as true . . . mere conclusory statement" that "the Plan's recordkeeping services were 'ministerial in nature'") (citation omitted); *Guyes v. Nestle USA, Inc.*, 2022 WL 18106384, at *4 (E.D. Wis. Nov. 21, 2022), *R. & R. adopted*, 2023 WL 22629 (E.D. Wis. Jan. 03, 2023) ("The complaint alleges in conclusory fashion that the recordkeeping fees were excessive relative to the recordkeeping services received . . . [and] alleges that the defendants received a standard package of [recordkeeping] services. Crucially, however, the complaint does not contain any allegations concerning the specific services performed by the comparator plans' recordkeepers or any allegations supporting a plausible inference that the plan paid more for equivalent services . . . . Absent that context, the court is left with only a naked fee-to-fee comparison, which does not permit a reasonable inference that the defendants' process of managing the plan's recordkeeping fees was imprudent.") (citing *CommonSpirit*, 37 F.4th at 1169)); *Laabs v. Faith Techs., Inc.*, 2022 WL 17418358, at *3 (E.D. Wis. Nov. 9, 2022) (stating that conclusory allegations that recordkeeping fees were excessive relative to the services rendered and that the defendant's plan "received a standard package of [recordkeeping] services" did not state a claim for breach of the duty of prudence); *Krutchen v. Ricoh USA, Inc.*, 2022 WL 16950264, at *3 (E.D. Pa. Nov. 15, 2022) (concluding plaintiffs failed to sufficiently allege the "specific services used" by the plan and the proffered comparators), *appeal filed*, No. 23-01928 (3d Cir. May 23, 2023); *Mator*, 2022 WL 3566108, at *4-5, *7 (granting motion to dismiss when plaintiffs alleged that the RKA services provided to large plans were essentially identical because plaintiffs "presented nothing beyond conclusory allegations regarding services with no particularity as to the quality of the services that [the plaintiffs] received").

the same[.]" 2023 WL 4851878, at *3.  And in *Kroger,* the plaintiff's allegations were rejected because they "fail[ed] to give any context to the services rendered to the Kroger Plan or to the services rendered to her comparable plans which may lead to the inference that the Kroger Plan's recordkeeping fees were excessive relative to the services rendered."  2023 WL 2431667, at *9. Considering that Plaintiffs here rely on the same allegations made through the same lawyers who filed the same complaints that were dismissed in the above cases, there is no reason for this Court to reach a different conclusion in applying Rule 12(b)(6).

And, if there were any doubt, the Complaint confirms that different recordkeepers provide different services to different plans.  The Complaint acknowledges that two of the three categories of RKA services alleged—"a la carte" and "ad hoc" services—are variable in nature and their plan-level costs are necessarily driven by the particular preferences and needs of plan participants.  *See* Compl. ¶¶ 62-66.  For example, the total loan fees incurred by a plan will vary depending on how many loans its participants require.  The same goes for QDRO fees, distribution fees, and brokerage fees—these are all costs that will, by definition, vary from participant to participant, from plan to plan, and year-to-year based on usage.  Plaintiffs offer no well-pleaded factual allegations that these participant-driven costs are equal across all "mega" plans.

Moreover, the Form 5500 documents on which the Complaint relies reveal that its comparator plans selected different RKA services.  The Forms 5500 contain "service codes" reflecting the specific categories of services for which the plan's recordkeeper was paid during the relevant year.  Here, the comparator plans' Forms 5500 show that "[t]hose [service] codes vary from plan to plan, with some plans listing more codes than others, suggesting that the particular services provided by the recordkeepers were not all the same; rather, they varied by type and/or quantity."  *Miller*, 2023 WL 2705818, at *5.  For example, in 2018, the AB Plan's Form 5500

14

indicates Fidelity provided five categories of services: trustee services (Code 25), participant loan processing (Code 37), recordkeeping services (Code 64), account maintenance (Code 65), and securities brokerage services (Code 71).[13]  In contrast, the Sutter Health Retirement Income Plan's 2018 Form 5500 shows Fidelity provided only three services to that plan: sub-transfer services (Code 60), recordkeeping services (Code 64), and account maintenance services (Code 65),[14] while the Tesla, Inc. 401(k) Plan's Form 5500 shows that its recordkeeper provided four categories of services (Codes 37, 60, 64, 65).[15] Meanwhile, the Forms 5500 for the Deseret 401(k) Plan and the Pilgrim's Pride Plan show the plans' recordkeepers provided just one category of services (Code 64).[16]  Thus, as in other cases rejecting similar RKA-fee claims, variations in publicly reported services among Plaintiffs' comparator plans confirm the implausibility of Plaintiffs' allegation that the RKA services the AB Plan received are necessarily equivalent to those received by their alleged comparator plans.  *See Miller*, 2023 WL 2705818, at *5-6; *Kroger*, 2023 WL 2431667, at *9 (dismissing claims because, among other reasons, "the Form 5500's show variations in reported services for the comparable plans"); *DENSO*, 2023 WL 4851878, at *4 (same); *Probst*, 2023 WL 1782611, at *11 (same).

By the same token, the variation in reported services demonstrates the implausibility of Plaintiffs' related assertion that any differences in RKA services from one plan to the other have no material impact on total RKA expenses.  Compl. ¶ 56.  Not only did the comparator plans report widely varying RKA services in their Forms 5500, but Plaintiffs' own chart (Compl. ¶ 94) indicates

---

[13] Ex. A, 2018 Form 5500 for the AB Plan, at 7.

[14] Ex. H, 2018 Form 5500 for the Sutter Health Retirement Income Plan, at 7.

[15] Ex. I, 2018 Form 5500 for the Tesla, Inc. 401(k) Plan, at 7.

[16] Ex. J, 2018 Form 5500 for the Deseret 401(k) Plan, at 7; Ex. K, 2018 Form 5500 for the Pilgrim's Pride Retirement Savings Plan, at 15.

those same plans reported paying widely varying direct fees (excluding indirect fees) of $23 to $39 per participant.  As the court recently explained in *Kroger*, these material "differences in costs and the differences in services reported among the comparable plans suggest that even minor variations in services impact per participant [RKA] fees." *Kroger*, 2023 WL 2431667, at *9; *see also* U.S. Dep't. of Labor, *A Look at 401(k) Plan Fees*, at 3 (Sept. 2019) (explaining that, whether RKA fees are charged directly, indirectly, or both, "generally the more services provided, the higher the fees").[17]

Apparently recognizing these problems, Plaintiffs argue that a stipulation signed by Fidelity in another lawsuit to resolve a discovery dispute confirms the universal "value" of Fidelity recordkeeping services is just $14 to $21 per participant.  Compl. ¶¶ 72-73; *Moitoso v. FMR LLC*, 1:18-CV-12122-WGY, ECF No. 138-67, at p. 3 (D. Mass.).  Plaintiffs emphasize that, in the stipulation, which the parties in *Moitoso* filed on the express condition that it would be valid for that lawsuit only, Fidelity represented that the above range applied to the value of recordkeeping services Fidelity provided to its *own* 401(k) plan and that Fidelity's own plan "did not receive any broader or more valuable recordkeeping services from Fidelity than the services received by any other Fidelity-recordkept plan with at least $1 billion in assets[.]" *Id*. ¶ 73.  From there, Plaintiffs argue that this means, "[i]n other words," that the "[AB] Plan did not receive any broader or more valuable recordkeeping services . . . than . . . any other Fidelity-recordkept plan with at least $1 billion in assets during the Class Period." *Id.* ¶ 74.  This argument fails on every level.

First, Plaintiffs' interpretation of the Fidelity stipulation makes no sense.  The stipulation states that the *Fidelity plan* received no "broader or more valuable" services than any other

---

[17]  The cited DOL article is available at https://www.dol.gov/sites/dolgov/files/ebsa/about-ebsa/our-activities/resource-center/publications/a-look-at-401k-plan-fees.pdf (last viewed Sept. 15, 2023).

Fidelity-recordkept plan; but it does not state the opposite.  That is, the stipulation does not state that other plans did ***not*** receive "broader or more valuable services" than those received by the Fidelity plan.  For example, one could declare that they ate *no more* for breakfast than anyone else at the diner, but that doesn't mean that everyone else at the diner ate the same amount or less—to the contrary, it means that *everyone* else at the diner ate the same amount *or more*.  So too here, Fidelity's statement that its own plan received "no broader or more valuable" services than other plans means that other plans may well have received *far broader or more valuable* services than those the Fidelity plan received.  And it certainly does not mean, as Plaintiffs contend, that the AB Plan necessarily received the same services as all other Fidelity-recordkept plans.

Second, Plaintiffs ignore that Fidelity has since clarified the stipulation.  More than two years ago, Fidelity filed a brief explaining that the stipulation above "does not reflect the value of recordkeeping services that Fidelity provides to *different plans* pursuant to *different recordkeeping contracts* for a *different set of services.*"  *Harmon v. Shell Oil Co.*, No. 3:20-cv-0021, Dkt. 134 (S.D. Tex. Mar. 1, 2021) (emphasis in original).  Unsurprisingly, then, courts have rejected identical arguments that the Fidelity stipulation supports excessive-RKA-fee claims, because it "does not explain which recordkeeping services could be purchased at between $14-$21, nor does [it] clarify which services [other plans] purchased."  *Mateya*, 2023 WL 4608536, at *6; *Wehner v. Genentech, Inc.*, 2021 WL 507599, at *6 (N.D. Cal. Feb. 9, 2021) (same); *Fritton v. Taylor Corp.*, 2022 WL 17584416, at *8 (D. Minn. Dec. 12, 2022) (same).

Finally, the Complaint itself alleges that its comparator plans paid a range of direct fees ($28 to $34 per participant) for Fidelity's RKA services in 2018 that is far greater than the range reflected in the Fidelity stipulation.  Compl. ¶ 94.  And a review of the Forms 5500 for those same

comparator plans indicates that the services Fidelity provided to those plans varied.[18]   For all of

the above reasons, the Fidelity stipulation cannot save Plaintiffs' claims from dismissal.

> ### C.   Plaintiffs' Fee-Comparison Allegations Fail Because They Do Not Accurately Calculate the Total Fees Paid by the Comparator Plans.

Even beyond the problems above, Plaintiffs' fee comparisons—which form the heart of

their argument that Defendants failed to discharge their fiduciary duties—fail to support any

plausible inference of fiduciary imprudence because they selectively discount the total fees paid

by their comparator plans.   They do this in three different ways.   First, they consider only the

"direct" fees the alleged comparator plans paid for RKA services in 2018, while ignoring the

"indirect" fees those plans also paid for RKA services, which, although unknown, could have a

material impact on the total fees paid by those plans.   Second, they make no attempt to account for

the proportion of RKA fees their alleged comparator plans paid for "a la carte" and "ad hoc"

services, relative to the AB Plan.   And third, Plaintiffs made obvious errors in calculating certain

comparator plan fees, which have the effect of further discounting those amounts.

As the Complaint recognizes, recordkeepers may collect their fees through direct plan

charges, indirect plan charges, or a combination of both: (1) "direct compensation paid to each

plan's recordkeeper directly," or (2) "indirect compensation" such as "revenue sharing" from plan

investment options.   Compl. ¶¶ 69, 77-78.   However, despite acknowledging that both types of

payments must be considered when calculating a plan's total RKA fees, the Complaint makes no

effort to do so for its comparator plans.   This is no small oversight.   No less than 14 of the

Complaint's 17 comparator plans paid both direct and indirect RKA fees—yet the Complaint

---

[18] For example, the Sutter Health Retirement Income Plan paid direct RKA fees to Fidelity for services identified by Codes 60, 64, and 65, while the Dow Chemical Company Employees' Savings Plan paid Fidelity for services identified by Codes 37, 50, 60, 64, and 65.   *See* Ex. H, Excerpts of 2018 Form 5500 for the Sutter Health Retirement Income Plan, at 7; Ex. L, Excerpts of 2018 Form 5500 for the Dow Chem. Co. Emp. Savings Plan, at 7.

ignores the latter category for the comparator plans, thereby artificially reducing its per-participant-fee calculations, while including the latter category when calculating the AB Plan's RKA fees.[19]  Obviously, comparing the total RKA fees the AB Plan paid to an artificially **discounted** version of the fees comparator plans paid cannot support a plausible inference that the AB Plan paid more in total—let alone that the total amount the AB Plan paid was so far outside the range of reasonable fees a prudent fiduciary could decide to pay as to support a plausible inference of fiduciary imprudence.  *See, e.g.*, *Miller*, 2023 WL 2705818, at *6 (dismissing complaint because it failed to account for "the amount of that indirect compensation" paid to comparator-plans' recordkeepers); *Mateya*, 2023 WL 4608536, at *8 (same because although the alleged comparator plans "report they paid their recordkeeper indirect fees, [the plaintiff] uses only direct fees to calculate those plans' expenses"); *Singh*, 2023 WL 186679, at *5 ("[P]laintiff's comparison is disingenuous because it compares the combined direct and indirect costs of the [challenged] Plan to only the direct costs of the comparator plans.").

Next, Plaintiffs' inclusion of "a la carte" and "ad hoc" service fees in the Plan's "Total RKA Fees" amount renders their calculations meaningless.  As the Complaint explains, "a la carte" services often have "separate, additional fees based on the conduct of individual participants and the usage of the service by individual participants."  Compl. ¶ 62.  These services can include "loan

---

[19] *See, e.g.*, Ex. H, Excerpts of 2018 Form 5500 for the Sutter Health Retirement Savings Plan, at 7; Ex. K, Excerpts of 2018 Form 5500 for the Pilgrim's Pride Retirement Savings Plan, at 15; Ex. M, Excerpts of 2018 Form 5500 for the JBS 401(k) Plan, at 15; Ex. N, Excerpts of 2018 Form 5500 for the Sanofi U.S. Group Savings Plan, at 7; Ex. U, Excerpts of 2018 Form 5500 for the Rite Aid 401(k) Plan, at 7; Ex. O, Excerpts of 2018 Form 5500 for the Kindred 401(k) Plan, at 7; Ex. J, Excerpts of 2018 Form 5500 for the Deseret 401(k) Plan, at 7; Ex. P, Excerpts of 2018 Form 5500 for the Danaher Corp. & Subsid. Savings Plan, at 7; Ex. I, Excerpts of 2018 Form 5500 for the Tesla, Inc. 401(k) Plan, at 7; Ex. L, Excerpts of 2018 Form 5500 for the Dow Chem. Emp. Savings Plan, at 7; Ex. Q, Excerpts of 2018 Form 5500 for the So. Cal. Permanente Plan, at 7; Ex. R, Excerpts of 2018 Form 5500 for the FedEx Office and Print Services, Inc. 401(k) Plan, at 7; Ex. S, Excerpts of 2018 Form 5500 for the Michelin 401(k) Savings Plan, at 7; Ex. T, Excerpts of 2018 Form 5500 for the Dollar General Corp. 401(k) Plan, at 7.

processing, brokerage services/account maintenance, distribution services, and processing of Qualified Domestic Relations Orders (QDROs)." *Id.* So, in any given year, "a la carte" fees will be higher in a particular plan if, for example, participants elect to take out more loans or receive more distributions. The same is true of "ad hoc" services. *See id.* ¶ 64. The problem is that, without knowing the relative proportion of a plan's total fees attributable to participant-elected "a la carte" or "ad hoc" services, it is impossible to meaningfully compare the reasonableness of a plan's total RKA fees to those of any other plan on a per-participant basis.[20] That is especially true here, because the Complaint contains no allegations about the AB Plan participants' utilization of "a la carte" and "ad hoc" services—such as participant loans, distributions, brokerage services, or others—relative to those of the alleged comparator-plan participants. Indeed, the Complaint does not even allege whether those participant-elective costs are included in the alleged RKA fees it attributes to the various comparator plans. *See Matousek*, 51 F.4th at 280 (explaining that without knowing the proportion of "fees arising out of participant-initiated transactions like 'loans' and 'distributions'" there can be no meaningful comparison).

Last, Plaintiffs misapply their own methodology for calculating comparator-plan fees. Plaintiffs estimate that the Sanofi plan paid just $23 per participant for RKA services in 2018, by dividing alleged fees of $558,527 by total participants of 24,097, as reported in the plan's Form

---

[20] An example helps illustrate the point. Consider two plans with exactly 10,000 participants that each pay exactly $36 per participant in combined direct and indirect fees for "bundled services," provided by Fidelity, but also pay $100 "a la carte" fees for each participant who takes out a loan. In this scenario, the participants in both plans pay a total of $360,000 for "bundled" services. However, if the participants in one plan took out 2,500 loans during the year, they would pay an additional $250,000 in fees ($610,000 in total), while the participants in the other plan who took out just 500 loans that year would pay only $50,000 in additional fees ($410,000 in total). Simply dividing the total RKA fees paid by total participants would suggest that the plan whose participants took out 2,500 loans during the year paid $61 per participant, while the participants in the second plan who took out fewer loans paid just $41 per participant. Under Plaintiffs' flawed methodology, this result would illogically suggest that the plan whose participants elected to take out more loans necessarily paid "unreasonable" RKA fees—an extra *$20 per participant*—even though both plans had the *exact same* fee arrangement.

5500. Compl. ¶ 94. In fact, however, the Form 5500 states that the Sanofi plan paid *$1,082,552* in direct RKA fees, equal to nearly *$45* per participant—nearly double the amount alleged.[21] Similarly, the Complaint includes RKA fees reportedly paid by the Rite Aid plan in 2018 to just one recordkeeper, Alight Solutions LLC. *Id.* ¶ 94. But the Form 5500 reports that the plan paid recordkeeping services (Code 15) to two different recordkeepers: Alight Solutions LLC and Northern Trust Investments.[22] When the fees to both vendors are counted, the Rite Aid plan's per-participant RKA fee increases from $33 to *$52* per participant.

## II.   Plaintiffs' Derivative Failure-to-Monitor Claim in Count II Should Be Dismissed.

In Count II, Plaintiffs allege that AB and its Board of Directors failed to prudently monitor the Committee, and therefore are derivatively liable for the Plan's allegedly excessive RKA fees. Compl. ¶¶ 138-45. As a matter of law, however, this claim can survive only if Plaintiffs' predicate claim in Count I is plausible. For the reasons discussed above, therefore, Plaintiffs' derivative claim in Count II should be dismissed. *See Miller*, 2023 WL 2705818, at *12 ("Because [plaintiff] fails to state a claim in Count 1 regarding RKA fees, he necessarily fails to state a claim in Count 4 regarding [the employer] and the Board [d]efendants' alleged failure to monitor the [c]ommittee [d]efendants."); *see also Saumer v. Cliffs Nat. Res. Inc.*, 2016 WL 8668509, at *8 (N.D. Ohio Apr. 1, 2016) (likewise dismissing derivative claims), *aff'd*, 853 F.3d 855, 865 (6th Cir. 2017).

Plaintiffs' failure-to-monitor claim is also deficient on its own terms because it rests entirely on legal conclusions, without any factual allegations about AB's or the Board's process for monitoring the Committee, or how that process was deficient. *See, e.g., Harmon v. FMC Corp.*, 2018 WL 1366621, at *5 (E.D. Pa. Mar. 16, 2018) (explaining that such a claim "falls short" where

---

[21] *See* Ex. N, excerpt from 2018 Form 5500 for the Sanofi U.S. Group Savings Plan at 3 (24,097 participants with balances at end of plan year), 7 (direct fees of $1,082,552 paid to recordkeeper).

[22] *See* Ex. U, excerpt from 2018 Form 5500 for the Rite Aid 401(k) Plan, at 3 (31,330 participants with balances at end of plan year), 7 (direct fees of $930,019 and $712,798 paid to recordkeepers).

it "offers no direct allegations of flaws in [d]efendants' process"); *Nicolas v. Trs. of Princeton Univ.*, 2017 WL 4455897, at \*5 (D.N.J. Sept. 25, 2017) (similar); *Romero v. Nokia, Inc.*, 2013 WL 5692324, at \*5 (N.D. Cal. Oct. 15, 2013) (similar).

## CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court dismiss the Complaint in its entirety and with prejudice, under Rule 12(b)(6).

Respectfully submitted,

*/s/ Christopher B. Boran*

Christopher B. Boran (admitted *pro hac vice*)
Christopher B. Dempsey (admitted *pro hac vice*)
Morgan, Lewis & Bockius LLP
110 North Wacker Drive, Suite 2800
Chicago, IL  60606
(312) 324-1000
christopher.boran@morganlewis.com
chris.dempsey@morganlewis.com

Jared R. Killeen (admitted *pro hac vice*)
Morgan, Lewis & Bockius LLP
1701 Market Street
Philadelphia, PA  19103
(215) 963-5000
jared.killeen@morganlewis.com

Michael W. Hawkins
Alina Klimkina
Dinsmore & Shohl LLP
101 South Fifth Street
Suite 2500
Louisville, KY  40202
(502) 540-2300
michael.hawkins@dinsmore.com
alina.klimkina@dinsmore.com

ATTORNEYS FOR DEFENDANTS

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a copy of the foregoing has been filed electronically on the 15th day of September 2023.  Notice of this filing will be sent to the following parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's electronic filing system.

*/s/ Christopher Boran*
Attorney for Defendants