UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION

| | |
|---|---|
| KENNETH DUKES, MARK A. GALE, CHRIS-TINE CHAVIS, AND DAVID R. FLY, individually, and as representatives of a Class of Participants and Beneficiaries of the AmerisourceBergen Corporation Employee Investment Plan,<br><br>Plaintiffs,<br><br>v.<br><br>AMERISOURCEBERGEN CORPORATION<br><br>and<br><br>BOARD OF DIRECTORS OF AMERISOURCEBER-GEN CORPORATION,<br><br>and<br><br>AMERISOURCEBERGEN CORPORATION BENE-FITS COMMITTEE<br><br>Defendants | Case No. 3:23CV-313-DJH |

---

## AMENDED COMPLAINT

---

COME NOW Plaintiffs, Kenneth Dukes, Mark A. Gale, Christine Chavis, and David R. Fly ("Plaintiffs"), individually and as representatives of a Class of Participants and Beneficiaries of the AmerisourceBergen Corporation Employee Investment Plan (the "Plan" or "AmerisourceBergen Plan"), by their counsel, WALCHESKE & LUZI, LLC, and PAUL HERSHBERG LAW, PLLC, as and for a claim against Defendants, allege and assert to the best of their knowledge, information, and belief, formed after an inquiry reasonable under the circumstances, the following:

## INTRODUCTION

1.      Plaintiffs are "participants" in a defined-contribution plan under ERISA Section 3(7), 29 U.S.C. § 1002(7): the AmerisourceBergen Corporation Employee Investment Plan (the "Plan" or "AmerisourceBergen Plan").

2.      The Plan is a Section 401(k) "defined contribution" pension plan under 29 U.S.C. § 1002(34), meaning that AmerisourceBergen, Inc.'s ("AmerisourceBergen") contributions to the payment of Plan costs is guaranteed but the pension benefits are not.  In a defined contribution plan, the value of participants' investments is "determined by the market performance of employee and employer contributions, *less expenses*." *Tibble v. Edison Int'l,* 575 U.S. 5, 525 (2015) (emphasis added).

3.      As a defined-contribution plan, the Plan allows participants to direct the investment of their contributions, but the investment options included in the Plan are selected by the Plan's fiduciary.

4.      AmerisourceBergen is the Plan Sponsor and a fiduciary of the Plan.  AmerisourceBergen assigned fiduciary administrative duties to the AmerisourceBergen Corporation Benefits Committee ("Benefits Committee") and to their members.

5.      Plaintiffs allege four ERISA violations against Defendants: two violations of the duty of prudence against the Benefits Committee under 29 U.S.C. § 1104(a)(1) for charging excessive Total recordkeeping and administrative ("RKA") and stable value fund fees, and two violations against AmerisourceBergen and its Board of Directors for failure to monitor fiduciaries on the Benefits Committee with regard to Plan Total RKA and stable value fund fees.

6.      Count I alleges a breach of fiduciary duty by Defendant Benefits Committee for incurring unreasonable Total RKA fees.  Among other things, Defendants paid over a 114% premium per-participant for Total RKA fees for the Plan to the Plan recordkeeper, Fidelity Investments Institutional ("Fidelity"), during the Class Period, compared to what a reasonable fee should have been for

materially similar RKA services.  Defendants should have lowered its Total RKA expenses by solicit-ing bids from competing providers and using its massive size and correspondent bargaining power to negotiate for fee rebates, but it did not do so or did so ineffectively.

7.      Count II alleges a breach of fiduciary duty by Defendant Benefits Committee for im-prudently selecting stable value funds with excessive fees during the Class Period.  More specifically, both the Morningstar stable value fund index and a specific, alternative stable value fund, the T. Rowe Price Stable Value Fund N, establish that meaningful benchmarks were paying substantially less for their stable value fund products.

8.      Counts III and IV allege a breach of fiduciary duty by AmerisourceBergen and the Board of Directors of AmerisourceBergen Corporation ("Board") for failing to monitor those mem-bers of the Benefits Committee responsible for paying reasonable Total RKA and stable value fund fees.

9.      Under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 *et seq.*, plan fiduciaries must discharge their duty of prudence "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." 29 U.S.C. § 1104(a)(1)(B).

10.     "In determining the contours of an ERISA fiduciary's duty, courts often must look to the law of trusts." *Tibble*, 575 U.S. at 528–29.  The Supreme Court has stated that "a trustee has a continuing duty to monitor trust investments and remove imprudent ones . . . separate and apart from the trustee's duty to exercise prudence in selecting investments at the outset." *Id.* at 529.  "If the fiduciaries fail to remove an imprudent investment from the plan within a reasonable time, they breach their duty." *Hughes v. Northwestern Univ.*, 142 S. Ct. 737, 742 (2002) (citing *Tibble*, 575 U.S. at 529-30). This continuing duty to monitor is a subset of the duty of prudence, *Tibble*, 575 U.S. at 529-30, and

includes two related components. *Hughes v. Northwestern Univ.*, 2023 WL 2607921, at *6 (7th Cir. Mar. 23, 2023) ("*Hughes II*").

11.     First, the duty of prudence requires a plan fiduciary to systematically review its funds both at the initial inclusion of a particular fund in the plan and at regular intervals to determine whether each is a prudent investment.

12.     Second, the duty of prudence requires a plan fiduciary to "incur only costs that are reasonable in amount and appropriate to the investment responsibilities of the trusteeship." *Tibble*, 843 F.3d at 1197 (quoting RESTATEMENT (THIRD) OF TRUSTS § 90(c)(3)).

13.     In the Sixth Circuit, plaintiffs must give the kind of context that could move their claims from possibility to plausibility by alleging that the fees were excessive relative to the services rendered and allege other facts concerning factors relevant to determining whether a fee is excessive under the circumstances. *See Smith v. CommonSpirit Health*, 37 F.4th 1160, 1169 (6th Cir. 2022).

14.     Cognizant of the impact of fees on plan value, fiduciaries must be vigilant in "negotiation of the specific formula and methodology" by which fee payments such as "revenue sharing will be credited to the plan and paid back to the plan or to plan service providers." DOL Advisory Opinion 2013-03A, 2013 WL 3546834, at *4.

15.     Although "a fiduciary need not constantly solicit quotes for recordkeeping services to comply with its duty of prudence, . . . fiduciaries who fail to monitor the reasonableness of plan fees and fail to take action to mitigate excessive fees - such as by adjusting fee arrangements, soliciting bids, consolidating recordkeepers, negotiating for rebates with existing recordkeepers, or other means - may violate their duty of prudence." *Hughes II*, 2023 WL 2607921, at *5.

16.     Defendants, AmerisourceBergen Corporation ("AmerisourceBergen"), the Board of Directors of AmerisourceBergen Corporation ("Board"), and the AmerisourceBergen Corporation Benefits Committee ("Benefits Committee") (collectively "Defendants"), are ERISA fiduciaries as they exercise discretionary authority or discretionary control over the 401(k) defined contribution

4

pension plan – known known as the AmerisourceBergen Corporation Employee Investment Plan (the "Plan" or "AmerisourceBergen Plan") – that it sponsors and provides to its employees.

17.     During the putative Class Period (June 9, 2017, through the date of judgment), Defendants, as fiduciaries of the Plan, as that term is defined under ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), breached the duty of prudence they owed to the Plan by requiring the Plan to "pay[ ] excessive recordkeeping [and administrative (RKA) fees," *Hughes*, 142 S. Ct. at 739-740, and by failing to remove their high-cost recordkeeper, Fidelity.[1]

18.     Defendants, as fiduciaries of the Plan, as that term is defined under ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), breached their fiduciary duty of prudence by "offer[ing] needlessly expensive investment options," in the form of expensive stable value funds furnished by Fidelity. *See Hughes*, 142 S. Ct. at 740.

19.     ERISA's duty of prudence applies to the conduct of the plan fiduciaries in negotiating Total RKA fees based on what is reasonable (not the *cheapest* or *average*) in the applicable market.

20.     With regard to investments, the focus is on each administrator's real-time decision-making process, not on whether any one investment performed well, net of fees, in hindsight. *Forman v. TriHealth, Inc.*, 40 F.4th 443, 448 (6th Cir. 2022) (citing *Pfeil v. State St. Bank & Tr. Co.*, 806 F.3d 377, 384–85 (6th Cir. 2015).

21.     There is no requirement to allege the actual inappropriate fiduciary actions taken because "an ERISA plaintiff alleging breach of fiduciary duty does not need to plead details to which he has no access, as long as the facts alleged tell a plausible story." *Allen v. GreatBanc Tr. Co.*, 835 F.3d 670, 678 (7th Cir. 2016).

22.     Nevertheless, there must be a sound basis for comparison in imprudence claims. *Forman*, 40 F.4th at 449.

---

[1]  Based on Form 5500s dating back to 2009, Fidelity has been the recordkeeper of the Plan for at least fifteen years.

23.     The unreasonable Total RKA and stable value fund fees compared to meaningful benchmarks inferentially and plausibly establishes that an adequate investigation would have revealed to a reasonable fiduciary that the Plan Total RKA services and the selected stable value funds were improvident. The facts alleged below show that a prudent fiduciary would have taken steps to reduce these Plan fees and improve Plan fund performance.  *See Hughes II*, 2023 WL 2607921, at *8.

24.     There is no "obvious alternative explanation that suggests [that Defendants'] conduct falls within the range of reasonable judgments a fiduciary may make based on [their] experience and expertise." *Id.*  Defendants' fiduciary decisions fall outside the range of reasonableness.  *Id.* at *9.

25.     These breaches of fiduciary duty caused Plaintiffs and Class Members tens of millions of dollars of harm in the form of lower retirement account balances than they otherwise should have had in the absence of these unreasonable Plan fees.

26.     To remedy these fiduciary breaches, Plaintiffs bring this action on behalf of the Plan under 29 U.S.C. § 1132(a)(2) to enforce Defendants' liability under 29 U.S.C. § 1109(a), to make good to the Plan all losses resulting from these breaches.

## JURISDICTION AND VENUE

27.     This Court has subject matter jurisdiction in this ERISA matter under 28 U.S.C. § 1331 and pursuant to 29 U.S.C. § 1332(e)(1), which provides for federal jurisdiction of actions brought under Title I of ERISA, 29 U.S.C. § 1001 *et seq.*

28.     This Court has personal jurisdiction over Defendants because they transact business in this District, reside in this District, and have significant contacts with this District, and because ERISA provides for nationwide service of process.

29.     Venue is appropriate in this District within the meaning of 29 U.S.C. §1132(e)(2) because some of the violations of ERISA occurred in this District and Defendants reside and may be found in this District.

30.     In conformity with 29 U.S.C. §1132(h), Plaintiffs serve the initial Complaint by certified mail on the Secretary of Labor and the Secretary of the Treasury.

## PARTIES

31.     Plaintiff Kenneth Dukes is a resident of the Commonwealth of Kentucky and currently resides in Hardinsburg, Kentucky, and during the Class Period, was a participant in the Plan under ERISA § 3(7), 29 U.S.C. § 1002(7).

32.     Plaintiff Dukes is a worker at the Brooks, Kentucky location of ICS, a large business unit of AmerisourceBergen, at 420 International Blvd., Brooks, KY 40109, from August 2021 through the present.

33.     During the Class Period, Plaintiff Dukes invested in the Fidelity Freedom Blend Target Date 2050 Fund.

34.     Plaintiff Mark A. Gale is a resident of the Commonwealth of Pennsylvania and currently resides in Conshohocken, Pennsylvania, and during the Class Period, was a participant in the Plan under ERISA § 3(7), 29 U.S.C. § 1002(7).

35.     Plaintiff Gale was both a Manager and Senior Manager of Finance at the AmerisourceBergen location at 1 W. 1st Avenue, Conshohocken, PA 19428, from April 2019 through May 2023.

36.     During the Class Period, Plaintiff Gale invested in the Fidelity Freedom Blend Target Date 2050 Fund and the Fidelity Managed Income Portfolio II Class 4 ("FMIP").

37.     Plaintiff Christine Chavis is a resident of the State of South Carolina and currently resides in Rock Hill, South Carolina, and during the Class Period, was a participant in the Plan under ERISA § 3(7), 29 U.S.C. § 1002(7).

38.     Plaintiff Chavis has worked remotely as a Service Manager in Enterprise IT Services at AmerisourceBergen from 2103 through the present.

39.     During the Class Period, Plaintiff Chavis invested in the Fidelity 500 Index Fund, Fidelity Growth Commingled Pool, JPM US Equity Fund, WA Core Bond Fund, and Fidelity Freedom Blend Target Date 2035 Fund.

40.     Plaintiff David R. Fly is a resident of the Commonwealth of Pennsylvania and currently resides in Bethlehem, Pennsylvania, and during the Class Period, was a participant in the Plan under ERISA § 3(7), 29 U.S.C. § 1002(7).

41.     Plaintiff Fly was a AMRE Manager III at the AmerisourceBergen Drug Company location at 5100 Jaindl Blvd., Bethlehem, PA 18017, from August 2005 through February 2022.

42.     During the Class Period, Plaintiff Fly invested in the Fidelity Global Index Funds, Fidelity Growth Commingled Pool, AmerisourceBergen Common Stock, WA Core Bond Fund, and Fidelity Freedom Blend Target Date 2020 Fund.

43.     Plaintiffs have Article III standing to bring this action on behalf of the Plan because they suffered actual injuries to their Plan accounts through paying excessive Total RKA fees during the Class Period.  Those injuries are fairly traceable to Defendants' unlawful conduct in maintaining Fidelity as its recordkeeper, and that harm is likely to be redressed by a favorable judgment providing appropriate equitable relief to the Plaintiffs and Class.

44.     Having established Article III standing, Plaintiffs may seek recovery under 29 U.S.C. § 1132(a)(2), ERISA § 502(a)(2), on behalf of the Plan and for relief that sweeps beyond their own injuries involving the underperformance of stable value funds.

45.     The Plaintiffs and all participants in the Plan did not have knowledge of all material facts (including, among other things, the excessive Total RKA fees and underperforming stable value funds) necessary to understand that Defendants breached their fiduciary duties until shortly before this suit was filed.

46.     Having never managed a mega 401(k) Plan, Plaintiffs, and all participants in the Plan, lacked actual knowledge of reasonable fee levels available to the Plan.

47.     AmerisourceBergen is a major American wholesale drug company for humans and animals and is headquartered in Conshohocken, Pennsylvania.  AmerisourceBergen handles about 20% of all of the pharmaceuticals sold and distributed throughout the United States and ranked 10th on the Fortune 500 list for 2020 with over $179 billion in annual revenue.  AmerisourceBergen will change its name to Cencora in mid-2023.  In this Complaint, "AmerisourceBergen" refers to the named Defendants, "Cencora," and all parent, subsidiary, related, predecessor, and successor entities to which these allegations pertain.

48.     AmerisourceBergen acted through its officers, including its Board of Directors, to perform Plan-related fiduciary functions in the course and scope of their business.  AmerisourceBergen and its Board appointed other Plan fiduciaries on the Benefits Committee and accordingly had a concomitant fiduciary duty to monitor and supervise those appointees.  For these reasons, AmerisourceBergen and its Board are fiduciaries of the Plan, within the meaning of 29 U.S.C. § 1002(21)(A).

49.     The Plan is administered by the Benefits Committee.  As the Plan Administrator, the Benefits Committee is a fiduciary with day-to-day administration and operation of the Plan under 29 U.S.C. § 1002(21)(A).  The Benefits Committee has authority and responsibility for the control, management, and administration of the Plan in accord with 29 U.S.C. § 1102(a), with all powers necessary to properly carry out such responsibilities.

50.     In 2021, the Plan had $1,917,838,771 in assets entrusted to the care of the Plan's fiduciaries.  The Plan thus had enormous bargaining power regarding Plan fees and expenses.  Defendants, however, did not regularly monitor Fidelity to ensure that Fidelity remained the prudent and objectively reasonable choices to provide Total RKA services, as illustrated by not reducing its Bundled RKA fees of $48 per participant per year for five years (2017-2021.)

51.     With 23,688 participants in 2021, the Plan had more participants than 99.94% of the defined contribution Plans in the United States that filed 5500 forms for the 2021 Plan year.  Similarly,

with $1,917,838,771 in assets in 2021, the Plan had more assets than 99.91% of the defined contribution Plans in the United States that filed 5500 forms for the 2021 Plan year.

## ERISA'S FIDUCIARY STANDARDS IN THE DEFINED CONTRIBUTION INDUSTRY

52.     Employers must: (1) establish a prudent process for selecting service providers; (2) ensure that fees paid to service providers are reasonable in light of the level and quality of services provided; and (3) monitor service providers once selected to make sure they continue to be prudent choices.

**Recordkeeping and Administration ("RKA") Services**

53.     Defined contribution plan fiduciaries of mega 401(k) plans hire service providers to deliver a retirement plan benefit to their employees.  There is a group of national retirement plan services providers commonly and generically referred to as "recordkeepers," that have developed bundled service offerings that can meet all the needs of mega retirement plans with a prudent and materially identical level and caliber of services.  Fidelity is the largest of such recordkeepers.

54.     There are numerous recordkeepers in the marketplace who are equally capable of providing a high level of service to mega defined contribution plans like the AmerisourceBergen Plan.

55.     All else being equal, the more participants a plan has, a recordkeeper will be able to provide a lower fee per participant to provide materially identical RKA services to maintain the same profit margin rate.  In addition, Fidelity has stated in the past that it relies on both participant-size and plan asset-size to make appropriate comparisons between plans.

56.     There are three types of RKA services provided by all recordkeepers.

57.     The first type, "Bundled RKA," includes:

a.      Recordkeeping;

b.      Transaction Processing (which includes the technology to process purchases and sales of participants' assets as well as providing the participants the access to investment options selected by the plan sponsor);

c.   Administrative Services related to converting a plan from one recordkeeper to another recordkeeper;

d.   Participant communications (including employee meetings, call centers/phone support, voice response systems, web account access, and the preparation of other communications to participants, e.g., Summary Plan descriptions and other participant materials);

e.   Maintenance of an employer stock fund;

f.   Plan Document Services which include updates to standard plan documents to ensure compliance with new regulatory and legal requirements;

g.   Plan consulting services including assistance in selecting the investments offered to participants;

h.   Accounting and audit services including the preparation of annual reports, e.g., Form 5500;

i.   Compliance support which would include, e.g., assistance interpreting plan provisions and ensuring the operation of the plan follows legal requirements and the provisions of the plan;

j.   Compliance testing to ensure the plan complies with Internal Revenue nondiscrimination rules; and

k.   Trustee/custodian services.

58.   According to the May 8, 2023 AmerisourceBergen Employee Investment Plan Participant Disclosure Notice under ERISA Section 404(a)(5), "Plan administrative fees may include recordkeeping, legal, accounting, trustee, and other administrative fees and expenses associated with maintaining the Plan.  Some plans may deduct these fees and expenses from individual accounts in the Plan." *Id.* at 4.

59.   This is the same boilerplate language that Fidelity uses for all the mega plans it recordkeeps.  There is nothing in the documents provided to Plan participants to suggest that there is anything exceptional, unusual, or customized about the Bundled RKA services provided to AmerisourceBergen Plan participants.

60.   In other words, the Plan provided participants all the commoditized Bundled RKA services provided to all other mega 401(k) plan participant.  The quality or type of RKA services

provided by competitor recordkeepers are comparable to that provided by Fidelity.  Any differences in these Bundled RKA services are immaterial to the price quoted by recordkeepers for such services.

61.     From 2017-2021, Fidelity charged the same Bundled recordkeeping and administrative fees to the AmerisourceBergen Plan of $48 per participant per year.  In 2022, that number dropped to $42 and to $36 in 2023.

62.     Since well before 2015, industry experts have maintained that for mega retirement plans like the AmerisourceBergen Plan, prudent fiduciaries treat Bundled RKA services as a commodity with little variation in price.  "Custody and recordkeeping are 'commodity' services.  Like any commodity, given equal quality, the key benchmark for these services is price.  The cheaper you can find competent custody and recordkeeping services, the better for participants."  Eric Droblyen, *Evaluating 401(k) Providers: Separating Commodity from Value-Added Services*, https://www.employeefiduciary.com/blog/evaluating-401k-providers-separating-commodity-value-added-services (Feb. 10, 2015).

63.     Because RKA services are commoditized, recordkeepers primarily differentiate themselves based on price, and will aggressively bid to offer the best price in an effort to win the business, particularly for mega plans like the Plan.

64.     RKA services are essentially fungible and the market for them is highly competitive.  This highly competitive RKA market is filled with equally capable recordkeepers, similar to Fidelity, who can provide comparable Bundled RKA services for less if only asked to provide bids to mega plans like the AmerisourceBergen Plan.

65.     Given the enormous size of the AmerisourceBergen Plan, the same price paid by the AmerisourceBergen Plan for Bundled RKA over the Class Period, and the trend of price compression for Bundled RKA from 2017-2021, it is possible to infer that Defendants did not engage in any competitive solicitation of RKA bids, or only ineffective ones, breaching their fiduciary duties of prudence.

66. The second type of essential RKA services, hereafter referred to as "A La Carte services," provided by all recordkeepers, often has separate, additional fees based on the conduct of individual participants and the usage of the service by individual participants. These "A La Carte RKA" services typically include the following:

      a.      Loan processing;

      b.      Brokerage services/account maintenance;

      c.      Distribution services; and

      d.      Processing of Qualified Domestic Relations Orders (QDROs).

67. According to the May 8, 2023 AmerisourceBergen Employee Investment Plan Participant Disclosure Notice under ERISA Section 404(a)(5), the Plan provided all such standard A La Carte usage services as other similar mega 401(k) plans do. *Id.* at 5.

68. The third type of RKA fees are Ad Hoc fees, which are transaction fees and other administrative fees, and include such things as ESOP fees, fees for service, and terminated maintenance fees.

69. According to the May 8, 2023 AmerisourceBergen Employee Investment Plan Participant Disclosure Notice under ERISA Section 404(a)(5), the Plan paid all the standard Ad Hoc RKA fees set out above and just like other comparable mega plans do.

70. Based on AmerisourceBergen Plan 5500s and other publicly available documents, AmerisourceBergen charged between $11 and $15, with an average of $12.50, for combined A la Carte and Ad Hoc RKA fees during the Class Period.

71. The sum of the Bundled RKA fees, A La Carte RKA fees, and Ad Hoc RKA fees equals the Total RKA fees.

72. Total RKA fee numbers represent the best methodology for determining apples-to-apples comparisons of plans as far as what is being charged for Total RKA.

73.     The methodology utilized in this Complaint for calculating the Total RKA for both the AmerisourceBergen Plan and for the comparison plans discussed below contains the following seven steps:

a.      taking the direct compensation paid to each plan's recordkeeper directly from Schedule C of Form 5500;

b.      reviewing the investments held by the plan listed in the supplemental schedule to Form 5500, Schedule H, Part IV, Line 4(i) – Schedule of Assets;

c.      reviewing Schedule C, Part I, Line 3 for revenue sharing earned by investments in the plan;

d.      cross-referencing publicly available revenue sharing rates for investment options by recordkeeping platform and custody and trading partners to determine whether each investment option contains any revenue sharing and, if so, what the appropriate revenue sharing rate is for each investment option in the plan;

e.      utilizing the year-end assets for each investment option from Form 5500, Schedule H, Part IV, Line 4(i) and multiply it by the appropriate revenue sharing rate to determine the amount of indirect compensation earned by the recordkeeper;

f.      reviewing the notes of the Audited Financial Statement attachment to Form 5500. In many cases, the notes to the Audited Financial Statement provide additional information that can determine each plan's pricing structure and whether any revenue sharing was allocated back to the plan and/or Plan Participants and, if so, how much; and

g.      reviewing the results for reasonableness and make revisions as appropriate based on Plaintiffs' non-testifying experts experience in evaluating plans at the different recordkeepers.

74.     Because the Total RKA offerings are fungible among all recordkeepers who provide services to mega plans, like the AmerisourceBergen plan, it is the standard and prevailing practice for retirement plan consultants and advisors to request quotes by asking what the recordkeeper's "revenue requirement" is on a per-participant basis for providing the Total RKA services.

75.     The revenue requirement is the amount of fees charged by the recordkeeper to provide the contracted services to the Plan.

76.     This approach is validated by the structure of the request for proposals (RFPs) sent out by retirement plan consultants and advisors and the responses provided by the recordkeepers and then the summary of the evaluations created by the retirement plan consultants and advisors.

77.     Fidelity, the largest 401(k) recordkeeper in the country, has in fact conceded in another recent case that the Total RKA services that it provides to mega plans are commodified, including the plan services provided to its own employees.

78.     As part of stipulated facts in a previous case, Fidelity stated: "The value of the record-keeping services that Fidelity provided to the Plan in 2014 was $21 per participant; the value of the recordkeeping services that Fidelity provided to the Plan in 2015 and 2016 was $17 per participant, per year, and the value of the recordkeeping services that Fidelity has provided to the Plan since January 1, 2017 is $14 per participant, per year.  Had the Plan been a third-party plan that negotiated a fixed fee for recordkeeping services at arm's length with Fidelity it could have obtained recordkeep-ing services for these amounts during these periods.  *The Plan did not receive any broader or more valuable recordkeeping services from Fidelity than the services received by any other Fidelity-recordkept plan with at least $1 billion in assets during the Class Period (November 18, 2014 to the present).*"  See *Moitoso v. FMR LLC, et al.*, 1:18-CV-12122-WGY, Stipulation of Facts, Dkt. 128-67, at 4-5 (D. Mass. Sep. 6, 2019) (emphasis added).

79.     In other words, because the AmerisourceBergen Plan is at least a two billion dollar Plan, Fidelity has conceded that the AmerisourceBergen Plan did not receive any broader or more valuable recordkeeping services from Fidelity than the services received by any other Fidelity-record-kept plan with at least $1 billion in assets during the Class Period.

80.     The investment options selected by plan fiduciaries often have a portion of the total expense ratio allocated to the provision of recordkeeping performed by the recordkeepers on behalf of the investment manager.

81.     Recordkeepers often collect a portion of the total expense ratio fee of the mutual fund in exchange for providing services that would otherwise have to be provided by the mutual fund. These fees are known as "revenue sharing" or "indirect compensation."

82.     The AmerisourceBergen Plan paid both direct and indirect RKA fees during the Class Period to Fidelity, as did a number of the comparator plans discussed below.

**Stable Value Fund Excessive Fees**

83.     Plan fiduciaries of a defined contribution plan have a continuing and regular responsibility to select and monitor all investment options they make available to plan participants.

84.     The primary purpose in selecting an investments is to give all participants the opportunity to create an appropriate asset allocation under modern portfolio theory by providing diversified investment alternatives.

85.     In selecting different investment options to make available to plan participants, the plan fiduciaries are held to the prudent investor standard when choosing investment managers. When choosing an active investment option, the analysis is focused on determining whether the portfolio manager is likely to outperform an appropriate, meaningful benchmark, net of fees.

## STANDARD OF CARE FOR PRUDENT FIDUCIARIES SELECTING AND MONITORING RECORDKEEPERS

86.     Prudent plan fiduciaries ensure they are paying only reasonable fees for recordkeeping by engaging in an "independent evaluation," see *Hughes*, 142 S. Ct. at 742, and soliciting competitive bids from other recordkeepers to perform the same level and quality of services currently being provided to the Plan. *See, e.g.,* U.S. DEPARTMENT OF LABOR, *Understanding Retirement Plan Fees and Expenses*, at 6, https://www.dol.gov/sites/dolgov/files/EBSA/about-ebsa/our-activities/resource-center/publications/understanding-retirement-plan-fees-and-expenses.pdf (last visited Oct. 10, 2022) ("Once you have a clear idea of your requirements, you are ready to begin receiving estimates from prospective providers.  Give all of them complete and identical information about your plan and the

16

features you want so that you can make a meaningful comparison. This information should include the number of plan participants and the amount of plan assets as of a specified date.").

87.     Prudent plan fiduciaries can easily receive a quote from other recordkeepers to determine if their current level of Total RKA fees is reasonable in light of the level and quality of recordkeeper fees. It is not a cumbersome or expensive process.

88.     It is the standard of care prevailing among industry experts to solicit competitive bids every three to five years. *See* CAPTRUST, *Understanding and Evaluating Retirement Plan Fees | Part One: A Holistic Approach*, https://www.captrust.com/understanding-and-evaluating-retirement-plan-fees-part-one-a-holistic-approach/ (stating "best practice is . . . a more formal recordkeeper search and selection process conducted approximately every three to five years. Recordkeeping and administrative fees should be evaluated and compared to plans of similar size and type that are receiving analogous services. While each plan is unique – making an apples-to-apples comparison imperfect – evaluating fees against similarly situated and sized plans provides a good reference point in helping to determine if plan fees are reasonable.").

89.     Having received bids, prudent plan fiduciaries can negotiate with their current recordkeeper for a lower fee or move to a new recordkeeper to provide a materially identical level and qualities of services for a more competitive reasonable fee if necessary.

90.     An internal benchmarking survey from CapTrust, Fiduciary Decisions, or a similar company, who provide these recordkeeping benchmarking services nationally to plans, is inadequate to determine a reasonable Total RKA fee. Such surveys skew to higher "average prices," that favor inflated Total RKA fees. To receive a "reasonable" Total RKA fee in the prevailing market, prudent plan fiduciaries engage in solicitations of competitive bids on a regular basis.

91.     Prudent fiduciaries implement three related processes to prudently manage and control a plan's RKA costs. *Tussey v. ABB, Inc.*, 746 F.3d 327, 336 (8th Cir. 2014).

92.     First, a hypothetical prudent fiduciary tracks the recordkeeper's expenses by demand-ing documents that summarize and contextualize the recordkeeper's compensation, such as fee trans-parencies, fee analyses, fee summaries, relationship pricing analyses, cost-competitiveness analyses, and multi-practice and standalone pricing reports.

93.     Second, to make an informed evaluation as to whether a recordkeeper is receiving no more than a reasonable fee for the quality and level of services provided to a plan, prudent hypothetical fiduciaries must identify all fees, including direct compensation and revenue sharing being paid to the plan's recordkeeper.

94.     Third, a hypothetical plan fiduciary must remain informed about overall trends in the marketplace regarding the fees being paid by other plans, as well as the recordkeeping rates that are available.  By soliciting bids from other recordkeepers, a prudent plan fiduciary can quickly and easily gain an understanding of the current market for the same level and quality of recordkeeping services.

95.     Accordingly, the best way to determine the *reasonable*, as opposed to the *cheapest* or *average*, market price for a given quality and level of RKA services is to obtain competitive bids from other providers in the market.  *Hughes II*, 2023 WL 2607921, at *5 (although "a fiduciary need not constantly solicit quotes for recordkeeping services to comply with its duty of prudence, . . . fiduciaries who fail to monitor the reasonableness of plan fees and fail to take action to mitigate excessive fees – such as by adjusting fee arrangements, soliciting bids, consolidating recordkeepers, negotiating for rebates with existing recordkeepers, or other means – may violate their duty of prudence.").

### THE PLAN PAID UNREASONABLE TOTAL RKA FEES TO FIDELITY

96.     A plan fiduciary must continuously monitor its Total RKA fees by regularly conduct-ing an independent evaluation of those fee to ensure they are reasonable and remove recordkeepers if those fees are unreasonable.  *See Hughes*, 142 S. Ct. at 742.

97.     During the Class Period, Defendants egregiously failed to regularly monitor the Plan's Total RKA fees paid to Fidelity because Defendants did not monitor and evaluate the performance

of individuals responsible for Plan Total RKA fees on the Benefits Committee and failed to monitor the process by which the Plan's recordkeeper, Fidelity, was evaluated and failing to investigate the availability of more reasonably-priced recordkeepers.

98.     During the Class Period, Defendants failed to regularly solicit quotes and/or competitive bids from recordkeepers, including but not limited to Fidelity, in order to avoid paying unreasonable Total RKA fees.

99.     More specifically, Defendants failed to remove individuals responsible for Plan Total RKA fees on the Benefits Committee whose performance was inadequate in that these individuals continued to pay the same Total RKA costs over numerous years even though solicitation of competitive bids would have shown that maintaining Fidelity as the recordkeeper at the contracted price was imprudent and excessive.  Defendants allowed the Plan to be charged more than double than what they should have been for at least five years.

100.    The difference between that the Plan should have paid and what the Plan did pay leads to the reasonable inference that Defendants were asleep at the wheel when its came to paying Total RKA fees for the Plan.

101.    During the Class Period, and unlike a hypothetical prudent fiduciary, Defendants followed a fiduciary process that was ineffective given the objectively unreasonable Total RKA fees it paid to Fidelity and in light of the level and quality of Total RKA services it received that were materially similar to services available through other recordkeepers and provided to other mega plans.

102.    As set forth in the table below, from the years 2017 through 2022, based upon information provided in 5500 Forms filed with the Department of Labor (DOL) and by the Plan fiduciaries to Plan participants in the Participant Required Disclosures under Section 404(a)(5), the Plan paid an effective average annual Total RKA fee of $60 per participant.

**Total Recordkeeping and Administration (Total RKA) Fees**

|  | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | *Average* |
|---|---|---|---|---|---|---|---|
| Participants | 20,474 | 21,650 | 22,586 | 23,044 | 23,688 | 23,688 | *22,522* |
| Est. Total RKA Fees | $1,263,765 | $1,277,049 | $1,362,789 | $1,446,317 | $1,436,609 | $1,321,852 | *$1,351,397* |
| Est. Total RKA Per Participant | $62 | $59 | $60 | $63 | $61 | $56 | *$60* |
| Reliable Est. of Reasonable Total RKA Fees | $573,272 | $606,200 | $632,408 | $645,232 | $663,264 | $663,264 | *$630,607* |
| Reliable Est. of Reasonable Total RKA Fees Per PP | $28 | $28 | $28 | $28 | $28 | $28 | *$28* |
| Est. Total RKA Losses | $690,493 | $670,849 | $730,381 | $801,085 | $773,345 | $658,588 | *$720,790* |
| Est. Total RKA Losses Per PP | $34 | $31 | $32 | $35 | $33 | $28 | *$32* |

103.    The table below illustrates the annual Total RKA fees paid by other comparable plans

of mega sizes in 2018, receiving a materially similar level and quality of Total RKA services (that all

mega plans receive from recordkeepers), compared to the 2018 annual Total RKA fee paid by the

Plan (as identified in the table above).

**Comparable Plans' Total RKA Fees Based on Publicly Available Information from Form 5500**
(Price calculations are based on 2018 Form 5500 information)

| Plan | Partici-pants | Total RKA Fee | Total RKA Fee /pp | Recordkeeper |
|---|---|---|---|---|
| Michelin 401(K) Savings Plan | 16,521 | $570,186 | $35 | Vanguard |
| Fedex Office And Print Services, Inc. 401(K) Retirement Savings Plan | 17,652 | $521,754 | $30 | Vanguard |
| Pilgrim's Pride Retirement Savings Plan | 18,356 | $486,029 | $26 | Great-West |
| JBS 401(K) Savings Plan | 19,420 | $481,539 | $25 | Great-West |
| **AmerisourceBergen Plan 2018 Fee** | **21,650** | **$1,277,049** | **$59** | **Fidelity** |
| Sanofi U.S. Group Savings Plan | 24,097 | $558,527 | $23 | T. Rowe Price |
| Genesis Healthcare 401(K) Plan | 24,574 | $803,751 | $33 | Wells Fargo |

104.    The comparator plans serviced by other recordkeepers and who charged less received

materially the same level and quality of Total RKA services given that these services are fungible and

commodified for mega Plan like the AmerisourceBergen Plan.  Indeed, each of these Plans note in

their fee disclosures and other Plan documents that they received Total RKA services materially iden-

tical to the AmerisourceBergen Plan in the form of recordkeeping, trustee, accounting, and other

administrative fees.

105.     From the years 2017 through 2022, the graph below illustrates the annual Total RKA fees paid by other comparable plans of similar sizes, receiving a materially identical level and quality of services, compared to the average Total RKA fees paid by the AmerisourceBergen Plan (as identified in the table above), with the white data points representing Total RKA fees that recordkeepers offered to (and were accepted by) comparable Plans.



106.     The trend line (dashed white in the graph above) generated from these data points represent a reasonable estimate of the fee rate that several recordkeepers, including Fidelity itself, serving the mega market would be willing to accept in a competitive environment to provide Total RKA services to the AmerisourceBergen Plan.

107.     From the years 2017 to 2022, the table and graph above illustrate that the Plan paid an effective average annual Total RKA fee of $60 per participant.

108.     A reasonable Total RKA fee for the AmerisourceBergen Plan based on the services provided by existing recordkeepers and the Plan's features, based on graph and charts above, would have been $28 per participant.

21

109.     The Total RKA fees paid by the Plan to Fidelity during the Class Period were excessive relative to the RKA services rendered.  More specifically, the Plan paid 214% more than what they should have paid for Total RKA during the Class Period.

110.     From the years 2017 through 2022 and based upon information derived from the Plan 5500 Forms and 404(a)(5) participant fee disclosure documents provided to participants in similarly sized plans, had Defendants been acting prudently, the Plan actually would have paid significantly less than an average of approximately $1,351,397 per year in Total RKA fees, which equated to an effective average of approximately $60 per participant per year.

111.     From the years 2017 through 2022, and based upon information derived from the Plan 5500 Forms and the 404(a)(5) participant fee disclosure documents provided to participants in similarly sized plans, as compared to other Plans of similar sizes receiving a materially identical level and quality of Total RKA services, had Defendants been acting prudently, the Plan actually would have paid on average a reasonable effective annual market rate for Total RKA of approximately $630,607 per year, which equates to approximately $28 per participant per year.  During the entirety of the Class Period, a hypothetical prudent plan fiduciary would not agree to pay *a 114% premium* for what they could otherwise pay for the materially identical level and quality of Total RKA services.

112.     From the years 2017 through 2022, and based upon information derived from the Plan 5500 Forms and 404(a)(5) participant fee disclosures, the Plan additionally cost its participants on average approximately $720,790 per year in unreasonable and excessive Total RKA fees, which equates to, on average, approximately $32 per participant per year.

113.     From the years 2017 to 2022, and because Defendants did not act with prudence, and as compared to other plans of similar sizes and with a materially identical level and quality of services, the Plan actually cost its participants a total minimum amount of approximately $4,324,743 in unreasonable and excessive Total RK&A fees.

114.     From the years 2017 to 2022, based upon information derived from the Plan 5500 Forms and 404(a)(5) participant fee disclosures, because Defendants did not act prudently, and as compared to other Plans of similar sizes and with a materially identical level and quality of services, the Plan caused Plan participants to suffer losses (when accounting for compounding percentages/lost market investment opportunity) a total cumulative amount in excess of $6,108,321 in Total RKA fees.

115.     Defendants could have received Total RKA services during the Class Period of the same level and quality from Fidelity or other recordkeepers that provide RKA services to mega plans, like the AmerisourceBergen plan, because the Plan 5500 Forms and Plan fee disclosures establish that the Plan received no services that were materially different than the services received by all the comparable plans in the chart above.

116.     To determine the Total RKA fees that other comparable plans are paying as evidence of the reasonable fee that a prudent plan fiduciary would have been able to obtain, Plaintiffs considered both the direct and indirect compensation collected *and retained* by recordkeepers as disclosed on publicly available Form 5500s.

117.     To ensure meaningful and apples-to-apples comparisons, Plaintiffs used the same methodology to compare the Total RKA fee rate paid by the Plan with the Total RKA Fee rate paid by other similarly situated and meaningfully comparable plans.

118.     **Michelin 401(k) Savings Plan** ("Michelin"): The reliable estimate of $35/pp is comprised of $35/pp in direct compensation paid to Vanguard  from Form 5500 Schedule C and a calculation of $0/pp in indirect compensation derived from multiplying the value of the assets of each investment disclosed on the attachment referenced on Schedule H, Part IV, Line 4i times the revenue sharing rates and pricing credits provided by recordkeepers, which are publicly available. In other words, none of the investment options in the Michelin plan appear to contain revenue sharing.

119.     The Michelin plan is a meaningful benchmark because in 2018 it had 16,521 participants, slightly less than the 21,650 participants in the Plan. The costs to a recordkeeper for providing

RKA services to a plan with more than around 5,000 participants are driven primarily by the number of participants.  There are no material differences in the RKA services provided to plans as large as both the Michelin plan and the Plan and any service differentials cannot explain the disparity between the fees paid by the Michelin Plan and the fees paid by the Plan.

120.     Therefore, fact that the Plan has slightly more participants than the Michelin plan does not make it a meaningless comparable plan because, all else being equal, if the Michelin plan can obtain a fee of $35/pp with 16,521 participants, then the Plan, with 21,650 participants, should be able to obtain a fee of around $35/pp, *or lower.*

121.     **FedEx Office and Print Services, Inc. 401(k) Retirement Savings Plan** ("FedEx"):  The reliable estimate of $30/pp is comprised of $30/pp in direct compensation paid to Vanguard from Form 5500 Schedule C and a calculation of $0/pp in indirect compensation derived from multiplying the value of the assets of each investment disclosed on the attachment referenced on Schedule H, Part IV, Line 4i times the revenue sharing rates and pricing credits provided by record-keepers, which are publicly available. In other words, none of the investment options in the FedEx plan appear to contain revenue sharing.

122.     The FedEx plan is a meaningful benchmark because in 2018 it had 17,652 participants, slightly less than the 21,650 participants in the Plan. The costs to a recordkeeper for providing RKA services to a plan with more than around 5,000 participants are driven primarily by the number of participants. There are no material differences in the RKA services provided to plans as large as both the FedEx plan and the Plan and any service differentials cannot explain the disparity between the fees paid by the FedEx plan and the fees paid by the Plan.

123.     Therefore, all else being equal, if the FedEx plan can obtain a fee of $30/pp with 17,652 participants, then the Plan, with 21,650 participants, should be able to obtain a fee of around $30/pp, *or lower.*

124.   **Pilgrim's Pride Retirement Savings Plan** ("Pilgrim's Pride"):  The reliable estimate of $26/pp is comprised of $13/pp in direct compensation paid to Great-West from Form 5500 Schedule C and a calculation of $13/pp in indirect compensation derived from multiplying the value of the assets of each investment disclosed on the attachment referenced on Schedule H, Part IV, Line 4i times the revenue sharing rates and pricing credits provided by recordkeepers, which are publicly available.

125.   The Pilgrim's Pride plan is a meaningful benchmark because in 2018 it had 18,356 participants, slightly less than the 21,650 participants in the Plan. The costs to a recordkeeper for providing RKA services to a plan with more than around 5,000 participants are driven primarily by the number of participants. There are no material differences in the RKA services provided to plans as large as both the Pilgrim's Pride plan and the Plan and any service differentials cannot explain the disparity between the fees paid by the Pilgrim's Pride plan and the fees paid by the Plan.

126.   Therefore, all else being equal, if the Pilgrim's Pride plan can obtain a fee of $26/pp with 18,356 participants, then the Plan, with 21,650 participants, should be able to obtain a fee of around $26/pp, *or lower*.

127.   **JBS 401(k) Savings Plan** ("JBS"):  The reliable estimate of $25/pp is comprised of $14.47/pp in direct compensation paid to Great-West from Form 5500 Schedule C and a calculation of $10.33/pp in indirect compensation derived from multiplying the value of the assets of each investment disclosed on the attachment referenced on Schedule H, Part IV, Line 4i times the revenue sharing rates and pricing credits provided by recordkeepers, which are publicly available.

128.   The JBS plan is a meaningful benchmark because in 2018 it had 19,420 participants, materially identical to the 21,650 participants in the Plan. The costs to a recordkeeper for providing RKA services to a plan with more than around 5,000 participants are driven primarily by the number of participants. There are no material differences in the RKA services provided to plans as large as

both the JBS plan and the Plan and any service differentials cannot explain the disparity between the fees paid by the JBS plan and the fees paid by the Plan.

129.    Therefore, all else being equal, if the JBS plan can obtain a fee of $25/pp with 19,420 participants, then the Plan, with 21,650 participants, should be able to obtain a fee of around $25/pp. The fact that the JBS plan had the materially identical number of participants in 2018 as the Plan, among other reasons, makes the JBS plan a meaningful comparable plan.

130.    **Sanofi U.S. Group Savings Plan** ("Sanofi"): The reliable estimate of $23/pp is comprised of $23/pp in direct compensation paid to T. Rowe Price from Form 5500 Schedule C and $0/pp in indirect compensation because, based on information in Sanofi's Form 5500 and attachments, all revenue sharing is returned to the plan.

131.    Therefore, it is not necessary to calculate the revenue sharing. Specifically, the "Notes to the Financial Statements" included in the Independent Auditor's Report filed by Sanofi with its Form 5500 describe the fee structure employed by Sanofi. The "Administrative Budget" section of Note 1 indicates that T. Rowe Price "will provide the Plan with funding for an administrative budget . . . . [which] may be used to pay certain administrative expenses of the Plan." The "Administrative Budget" section of Note 1 goes on to state that "[i]ncluded with the [2018] year end balances [of the administrative budget account] are revenue sharing contribution receivables of $127,500 . . . ." This amount is roughly one quarter of the $524,025 amount contributed by T. Rowe Price for all of 2018 as indicated in Note 1 (see below).

132.    The Sanofi plan is a meaningful benchmark because in 2018 it had 24,097 participants, which is slightly more than the 21,650 participants in the Plan and provides a data point that enables the calculation of a trendline that is used to generate a reliable estimate of the reasonable market rate for RKA services across a range of participants and which declines as a plan gains more participants. The costs to a recordkeeper for providing RKA services to a plan with more than around 5,000 participants are driven primarily by the number of participants. There are no material differences in the

RKA services provided to plans as large as both the Sanofi plan and the Plan and any service differentials cannot explain the disparity between the fees paid by the Sanofi plan and the fees actually paid by the Plan.

133.    The fact that the Plan has fewer participants than the Sanofi plan does not make the Sanofi plan a meaningless comparable plan. Plaintiffs do not contend the Plan should have necessarily been able to obtain a fee as low as the $23/pp paid by the Sanofi plan. Rather, as noted above, the Sanofi plan Total RKA fee provides a data point that enables the production of a trendline that provides reliable evidence of the reasonable fee rate for RKA services across a range of between around 15,000 and 25,000 participants. The massive disparity between the reliable estimate of the reasonable market Total RKA fee rate for RKA services for the Plan (based on having 21,650 participants) of around $28/pp and the Plan's actual Total RKA fee rate of around $59/pp leads to a reasonable inference that the Plan's process was not prudent.

134.    **Genesis Healthcare 401(k) Plan** ("Genesis"):  The reliable estimate of $33/pp is derived directly from Genesis' Form 5500 Note F to the Financial Statements which explicitly states that the total fees paid by the Genesis plan were "$1,403,143 which consisted of $803,751 for recordkeeping and trustee fees and $599,392 for advisory fees." Schedule C of the Genesis plan's Form 5500 discloses direct compensation with no indirect compensation paid to three service providers that equal $599,392.

135.    This fee structure would result in all revenue sharing used by the Genesis plan to pay compensation to the recordkeeper Wells Fargo being disclosed as direct compensation.  This is also supported by the fact that the Genesis plan discloses "Other Income" in both Schedule H as well as in the Financial Statement accompanying the Auditor's Report. When revenue sharing is returned to a plan-level account it is typically identified as "Other Income." When read together and holistically,

the information provided in the Genesis plan's Form 5500 and accompanying Auditor's Report indicate that any indirect compensation derived from any Genesis plan investments was not retained by the Genesis plan's recordkeeper, Wells Fargo, as compensation for providing RKA services.

136.    The Genesis plan is a meaningful benchmark because in 2018 it had 24,574 participants, which is slightly more than the 21,650 participants in the Plan and provides a data point that enables the calculation of a trendline that is used to generate a reliable estimate of the reasonable market rate for RKA services across a range of participants and which declines as a plan gains more participants. The costs to a recordkeeper for providing RKA services to a plan with more than around 5,000 participants are driven primarily by the number of participants. There are no material differences in the RKA services provided to plans as large as both the Genesis plan and the Plan and any service differentials cannot explain the disparity between the fees paid by the Genesis plan and the fees actually paid by the Plan.

137.    The fact that the Plan has fewer participants than the Genesis plan does not make the Genesis plan a meaningless comparable plan. Plaintiffs do not contend the Plan should have necessarily been able to obtain a fee as low as the Genesis plan. Rather, as noted above, the Genesis plan Total RKA fee provides a data point that enables the production of a trendline that provides reliable evidence of the reasonable fee rate for RKA services across a range of between around 15,000 and 25,000 participants. The massive disparity between the reliable estimate of the reasonable market Total RKA fee rate for RKA services for the Plan (based on having 21,650 participants) of around $28/pp and the Plan's actual Total RKA fee rate of around $59/pp leads to a reasonable inference that the Plan's process was not prudent.

138.    Viewing all the data points provided by the comparable plans set forth above holistically and in the full context of how the retirement plan industry operates provides evidence to support a reasonable inference that the Plan paid unreasonable and excessive fees for RKA services.

139.    The market for RKA services is not transparent. Recordkeepers do not provide transparency related to the fees they charge all their clients, nor do they provide transparency related to the bids they provided throughout the Class period for other plans with a similar number of participants as the Plan.

140.    Recordkeepers are able to negotiate at arm's length with plan fiduciaries and will happily accept higher fees from plan fiduciaries who are unaware of the reasonable market rate through, for example, failing to solicit competitive bids, among other reasons.

141.    Due to the lack of transparency, the primary and most significant driver of the disparity between the actual RKA fees paid by plans with similar numbers of participants greater than around 5,000 is the actual practices of the plans' fiduciaries.

142.    The most plausible explanation of the disparity of between $24/pp and $36/pp from the comparable plans and the Plan (an excess of between 71% and 154%) is that the Plan's fiduciaries engaged in imprudent conduct.

143.    The disparity between the fee rates of the comparable plans based on the amount of participants in each of the plans and the reliable estimate based on the trend line created by the comparable plans fee rates is less than $7 per participant or less and are most plausibly explained by minor variations in negotiation tactics and circumstances among the fiduciaries of the comparable plans and the various recordkeepers.

144.    This is in stark contrast to the disparity of $31 per participant paid by the plan compared to the reliable estimate of a reasonable fee rate for a plan with 21,650 participants of around $28.

145.    A summary of the compensation and administrative credits of the comparator plans is provided below.

|  | Michelin | Fedex | Pilgrim's Pride | JBS | Sanofi | Genesis |
|---|---|---|---|---|---|---|
|  | Vanguard | Vanguard | Great-West | Great-West | T. Rowe Price | Wells Fargo |
| Participants (#) | 16,521 | 17,652 | 18,356 | 19,420 | 24,097 | 24,574 |
| Direct Compensation (Schedule C) ($) | $570,186 | $521,754 | $242,994 | $280,974 | $1,082,552 | $803,751 |
| Indirect Compensation (Rev Share) ($) | $0 | $0 | $243,035 | $200,565 | N/A | N/A |
| Administrative Credit to Plan ($) | $0 | $0 | $0 | $0 | ($524,025) | $0 |
| Annual RK&A Fees ($) | $570,186 | $521,754 | $486,029 | $481,539 | $558,527 | $803,751 |
| Annual RK&A Fees ($/pp) | $35 | $30 | $26 | $25 | $23 | $33 |

146.    Although the United States Supreme Court noted in *Hughes* that "[a]t times, the circumstances facing an ERISA fiduciary will implicate difficult tradeoffs, and courts must give due regard to the range of reasonable judgments a fiduciary may make based on her experience and expertise," *Hughes*, 142 S. Ct. at 742, no reasonable tradeoffs existed here because recordkeepers for mega plans, like the AmerisourceBergen Plan, are providing the materially same level and quality of commoditized services.

147.    Defendants failed to take advantage of the Plan's enormous size to timely negotiate lower fees from its existing recordkeeper, Fidelity.  Defendants remarkably paid the same Bundled RKA fee of $48.00 for five years (2017-2021) when other comparator plans were able to negotiate Total RKA services for less than half that much for the materially same Total RKA services during that same period.

148.    Defendants could have obtained the same Total RKA services for less from other recordkeepers or from Fidelity itself had it only leveraged its mega size.

149.    Defendants did not conduct effective or competitive bidding for Total RKA services, and failed to use the Plan's massive size to negotiate rebates from Fidelity.

150.    Plaintiffs and Class Members paid these excessive Total RKA fees in the form of direct and indirect compensation to the Plan and suffered injuries to their Plan accounts as a result.

151.    Plaintiffs have participated in many other large or mega 401(k) plans from other employers, and there has been no material differences in the services that they have received.

152.    During the entirety of the Class Period, and had Defendants engaged in regular and/or reasonable examination and competitive comparison of the Total RKA fees it paid to Fidelity, it would

have realized that the Plan was compensating Fidelity unreasonably and inappropriately for its size and scale, passing these objectively unreasonable and excessive fee burdens to Plaintiffs and other Plan participants, and therefore should have removed Fidelity as Plan recordkeeper during the Class Period. Instead, it kept Fidelity at these inflated Total RKA fee prices.

153.     During the entirety of the Class Period and by failing to recognize that the Plan and its participants were being charged much higher Total RKA fees than they should have been and/or by failing to take effective remedial actions including removing Fidelity as the Plan recordkeeper, Defendants breached their fiduciary duty of prudence to Plaintiffs and to other Plan participants, causing millions of dollars of harm to Plaintiffs and Class Member's retirement accounts.

## EXCESSIVE STABLE VALUE FUND FEES

154.     The Fidelity Managed Income Portfolio (FMIP) is a type of stable value fund. Stable value funds are fairly common in 401(k) plans.

155.     In most cases, stable value products make use of special contracts known as "GICs" or "wraps" that have their own risk and return characteristics. Stable value funds generally are not mutual funds and usually are structured as an insurance company general account, an insurance company separate account, or a synthetic account. The differences between the different types of funds are critical from a fiduciary evaluation.

156.     A stable value account in a retirement plan is (i) similar to a money market fund in that it provides liquidity and principal protection, and (ii) similar to a bond fund in that it provides consistent returns over time.  It differs from both in that it seeks to generate returns greater than a money market and equivalent to a short – to intermediate – term bond fund.

157.     Stable value funds are able to do this because participant behavior is such that the amount of money invested in the account is relatively stable over time. This enables fund providers to offer better crediting rates (the rate of return) and to guarantee participants will not lose money by ensuring the fund transacts at book value. Stable value accounts also "stabilize" the returns through

the use of an imbedded formula which is part of the contract with the plan that smooths out the volatility of the fund that results from fluctuations in interest rates associated with bond funds.

158.     There are several different types of stable value accounts in the 401(k) marketplace. Large retirement plans often offer "synthetic" stable value funds, which are the least risky, because principal is guaranteed by multiple "wrap providers" and the fund owns the assets of the underlying funds. Separate account products, where the assets of the underlying funds are held in the separate account of an insurance carrier are slightly riskier, because there is only one "wrap" provider. As a result, they offer higher crediting rates.

159.     Under the standard of care, prudent fiduciaries would, among other things, continuously monitor the performance of the FMIP compared to appropriate benchmarks and other investment alternatives that would satisfy ERISA's stability investment option requirement to give participants at least three investment options necessary to achieve a diversified portfolio.

160.     Under the standard of care, if a stability investment option regularly underperforms an index and/or other prudent stability alternatives, a prudent fiduciary would replace the underperforming option with a prudent option that was determined to be less likely to underperform going forward.

161.     Morningstar is a very well-known and highly-respected investment research firm that compiles and analyzes investment and market data.

162.     Prudent fiduciaries frequently use Morningstar indexes as benchmarks to monitor the performance of investment options made available to plan participants.

163.     Morningstar provides an overview and description of the MSVI as follows:

> The Morningstar US CIT Stable Value Index ("MSVI") measures the performance of approximately 75% of the U.S. collective investment trust stable-value fund pooled universe. The index serves as a benchmarking tool for stable-value asset managers and provides insight into stable-value market trends. The index is equally weighted and rebalanced monthly.

164.    The MSVI is equally weighted which means that as long as the performance of the 75% of the U.S. collective trust stable-value fund universe was not virtually identical, then roughly 50% of the funds in the universe outperformed the index.

165.    As the charts below illustrate, the FMIP consistently underperformed the MSVI for several years both prior to and throughout the class period.

| Plan Year | Class | Assets ($) | Fidelity Managed Income Portfolio (%) | Morningstar Stable Value Index (%) | Difference (%) | Difference ($) |
|---|---|---|---|---|---|---|
| 2012 | Class II | $79,220,733 | 1.44% | 2.26% | 0.82% | $646,726 |
| 2013 | Class II | $73,619,638 | 1.19% | 1.84% | 0.66% | $482,599 |
| 2014 | Class II | $68,620,170 | 1.26% | 1.69% | 0.43% | $292,514 |
| 2015 | Class II | $68,101,359 | 1.48% | 1.77% | 0.29% | $198,318 |
| 2016 | Class II | $73,666,861 | 1.58% | 1.79% | 0.21% | $155,437 |
| 2017 | Class II | $72,894,249 | 1.62% | 1.96% | 0.34% | $247,840 |
| 2018 | Class II | $75,671,789 | 1.92% | 2.23% | 0.31% | $234,583 |
| 2019 | Class II | $72,527,804 | 2.24% | 2.51% | 0.27% | $195,825 |
| 2020 | Class IV | $92,975,127 | 1.97% | 2.24% | 0.27% | $251,033 |
| 2021 | Class IV | $91,848,088 | 1.32% | 1.74% | 0.42% | $385,762 |
| 2022 | Class IV | $97,256,141 | 1.40% | 1.88% | 0.48% | $466,829 |
| | | | | | Total Difference ($): | $3,557,467 |

166.    The FMIP and the T. Rowe Price Stable Value N ("TRPN") are two stable value funds that are meaningfully comparable to one another and can be viewed as providing a sound basis of comparison for purposes of showing that the Plan overpaid for the FMIP.

167.    Both follow a similar investment strategy and similar implementation of that investment strategy.

168.    The FMIP and TRPN invest in similar vehicles, i.e. guaranteed investment contracts ("GICs"), bank investment contracts ("BICs"), synthetic investment contracts ("SICs"), and/or separate account contracts ("SACs"), fixed income securities, and money market funds.

169.     Any investment contracts in which they invest are offered by insurance companies and other financial institutions that provide for the payment of a specified rate of interest to the portfolio and the repayment of principal at maturity.

170.     Both funds also have similar management fee levels for the share classes in question of 0.20%/ 0.15% per year for both funds (as of June 30, 2023).[1]

171.     Both funds also both have sizable assets under management (AUM) of about $19 billion (Fidelity) and about $22 billion (T. Rowe Price) as of December 31, 2022.

172.     This means that both funds have ample investment capacity for new investments up to a least $1 billion, if not more.

173.     Both funds are also low-duration funds. Therefore, their fund value only changes very little as a result of changing interest rates in the market. This feature is in line with their investment mandate as stable value funds.

174.     Yet, even given that these two funds provide a sound basis of comparison based on many different metrics, the charts below illustrate that the FMIP was consistently more expensive by many millions of dollars as compared to the alternative TRPN stability option both prior to, and throughout, the Class Period.

---

[1] The management fee of the T. Rowe Price Stable Value Fund N was 0.2% as of 30 June 2023 and the management fee of the Fidelity Managed Income Portfolio II (Class II) was 0.2% and the management fee of the Fidelity Managed Income Portfolio II (Class IV) was 0.15% as of 30 June 2023.

| Plan Year | Class | Assets ($) | Fidelity Managed Income Portfolio (%) | T. Rowe Price Stable Value N (%) | Difference (%) | Difference ($) |
|---|---|---|---|---|---|---|
| 2012 | Class II | $79,220,733 | 1.44% | 2.48% | 1.04% | $821,733 |
| 2013 | Class II | $73,619,638 | 1.19% | 2.23% | 1.04% | $768,883 |
| 2014 | Class II | $68,620,170 | 1.26% | 2.08% | 0.82% | $560,840 |
| 2015 | Class II | $68,101,359 | 1.48% | 2.03% | 0.55% | $376,689 |
| 2016 | Class II | $73,666,861 | 1.58% | 1.90% | 0.32% | $233,273 |
| 2017 | Class II | $72,894,249 | 1.62% | 1.96% | 0.34% | $245,901 |
| 2018 | Class II | $75,671,789 | 1.92% | 2.18% | 0.26% | $197,882 |
| 2019 | Class II | $72,527,804 | 2.24% | 2.33% | 0.09% | $68,619 |
| 2020 | Class IV | $92,975,127 | 1.97% | 2.16% | 0.19% | $177,685 |
| 2021 | Class IV | $91,848,088 | 1.32% | 1.86% | 0.54% | $385,762 |
| 2022 | Class IV | $97,256,141 | 1.40% | 1.80% | 0.40% | $389,025 |
| | | | | | Total Difference ($): | $4,226,291 |

175.     Having selected a stable value option for the stability requirement for the plan, there are no other considerations under modern portfolio theory, such as diversification of underlying holdings and wrap providers, aggregate credit quality and duration, contract features, fee transparency, termination options, or portability, that reasonably warrant the selection and retention of the FMIP over less expensive stable value options like the TRPN throughout the Class Period.

176.     Accordingly, both the MSVI and the TRPN stability option provide meaningful benchmarks to use in evaluating whether the plan fiduciaries employed an imprudent process by selecting and retaining the FMIP for the Plan prior to and throughout the Class period.

177.     The performance data set forth above leads to a reasonable inference that the Plan fiduciaries did not employ a prudent process.

178.     As an ERISA fiduciary, Defendants had an obligation to monitor the fees of the FMIP to remove or replace it where a substantially identical investment option can be obtained from the same or similar provider at a lower cost.  *See, e.g., Tibble v. Edison Int'l*, 843 F.3d 1187, 1198 (9th Cir. 2016) ("[A] trustee cannot ignore the power the trust wields to obtain favorable investment products, particularly when those products are substantially identical -- other than their lower cost -- to products

the trustee has already selected.")

179.    On the basis of the excessive spread fees, the FMIP was an imprudent investment which should have been removed from the Plan. Not only were participants charged excessive fees, but they also lost the opportunity to invest their money in asset classes that delivered higher returns.

180.    A plan with millions of dollars in a stable value fund, like the AmerisourceBergen Plan, has considerable bargaining power in the marketplace. There are any number of stable value products, like the TRPN, available to plans with this large amount of money that are simply not available to plans with funds of a smaller size.

181.    To take advantage of this bargaining power, Defendants should have submitted requests for proposal ("RFPs") to stable value fund providers approximately every three years. Products from any number of providers were available with better products, lower fees, and higher crediting rates, including the TRPN.

182.    The FMIP is an imprudent investment and should have been removed from the Plan. Because this stable value fund investment was not removed from the Plan in a timely manner, Defendants breached their fiduciary duty of prudence, causing Plaintiffs and Plan participants millions of dollars of losses to their retirement accounts.

## CLASS ACTION ALLEGATIONS

183.    29 U.S.C. § 1132(a)(2) authorizes any participant or beneficiary of the Plan to bring an action individually on behalf of the Plan to enforce a breaching fiduciary's liability to the Plan under 29 U.S.C. § 1109(a).

184.    In acting in this representative capacity, Plaintiffs seeks to certify this action as a class action on behalf of all participants and beneficiaries of the Plan. Plaintiffs seeks to certify, and to be appointed as representative of, the following two Classes:

Subclass A (for RKA fees):

All participants and beneficiaries of the AmerisourceBergen Employee Investment Plan (excluding the Defendants or any participant/beneficiary who is a fiduciary to the Plan) beginning June 9, 2017, and running through the date of judgment.

Subclass B (for Stable Value Fund fees):

All participants and beneficiaries of the AmerisourceBergen Employee Investment Plan (excluding the Defendants or any participant/beneficiary who is a fiduciary to the Plan) beginning June 9, 2017, and running through the date of judgment who were at any time invested in the Fidelity Managed Income Portfolio Fund within the Plan.

185.    The two Subclasses combined include approximately 24,000 members and is so large that joinder of all its members is impracticable, pursuant to Federal Rule of Civil Procedure 23(a)(1).

186.    There are questions of law and fact common to this Class pursuant to Federal Rule of Civil Procedure 23(a)(2), because Defendants owed fiduciary duties to the Plan and took the actions and omissions alleged as the Plan and not as to any individual participant.  Common questions of law and fact include but are not limited to the following:

  a. Whether Defendants are fiduciaries liable for the remedies provided by 29 U.S.C. § 1109(a);

  b. Whether Defendants breached their fiduciary duties to the Plan;

  c. What are the losses to the Plan resulting from each breach of fiduciary duty; and

  d. What Plan-wide equitable and other relief the Court should impose in light of Defendants' breach of fiduciary duty.

187.    Plaintiffs' claims are typical of the claims of the pertinent Subclasses pursuant to Federal Rule of Civil Procedure 23(a)(3), because Plaintiffs were participants during the time period at issue and all participants in the Plan were harmed by Defendants' misconduct in the same manner and under the same legal theories.

188.    Plaintiffs will adequately represent the Class pursuant to Federal Rule of Civil Procedure 23(a)(4), because they were participants in the Plan during the Class period, have no interests that

conflict with the Class, are committed to the vigorous representation of the Class, and have engaged experienced and competent lawyers to represent the Class.

189.    Certification is appropriate under Federal Rule of Civil Procedure 23(b)(1), because prosecution of separate actions for these breaches of fiduciary duties by individual participants and beneficiaries would create the risk of (1) inconsistent or varying adjudications that would establish incompatible standards of conduct for Defendant concerning its discharge of fiduciary duties to the Plan and personal liability to the Plan under 29 U.S.C. § 1109(a), and (2) adjudications by individual participants and beneficiaries regarding these breaches of fiduciary duties and remedies for the Plan would, as a practical matter, be dispositive of the interests of the participants and beneficiaries who are not parties to the adjudication, or would substantially impair those participants' and beneficiaries' ability to protect their interests.

190.    Certification is also appropriate under Federal Rule of Civil Procedure 23(b)(2) because Defendants have acted or refused to act on grounds that apply generally to the Class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole.

191.    Plaintiffs' attorneys have substantial and varied experience in complex ERISA and class action litigation and will adequately represent the Class.

192.    The claims brought by the Plaintiffs arise from fiduciary breaches as to the Plan in its entirety and does not involve mismanagement of individual accounts.

193.    The claims asserted on behalf of the Plans in this case fall outside the scope of any exhaustion language in the individual participants' Plan.  Exhaustion is intended to serve as an administrative procedure for participants and beneficiaries whose claims have been denied and not where a participant or beneficiary brings suit on behalf of a Plan for breaches of fiduciary duty.

194.    Under ERISA, an individual "participant" or "beneficiary" is distinct from an ERISA Plan. A participant's obligation – such as a requirement to exhaust administrative remedies – does not, by itself, bind the Plan.

195.     Moreover, any administrative appeal would be futile because the entity hearing the appeal (the Plan Administrator) is the same Plan Administrator that made the decisions that are at issue in this lawsuit. Policy supporting exhaustion of administrative remedies in certain circumstances – that the Court should review and where appropriate defer to a Plan administrator's decision – does not exist here because courts will not defer to Plan administrator's legal analysis and interpretation.

**FIRST CLAIM FOR RELIEF**
**Breach of Duty of Prudence of ERISA, as Amended**
**(Plaintiffs, on behalf of themselves and Class, Against**
**Defendant Benefits Committee – Total RKA Fees)**

196.     Plaintiffs restate the above allegations as if fully set forth herein.

197.     Defendant Benefits Committee is a fiduciary of the Plan under 29 U.S.C. §§ 1002(21) and/or 1102(a)(1).

198.     29 U.S.C. § 1104(a)(1)(B) imposes a fiduciary duty of prudence upon Defendant Benefits Committee in its administration of the Plan.

199.     Defendant Benefits Committee, as a fiduciary of the Plan, is responsible for selecting a recordkeeper that charges objectively reasonable Total RKA fees.

200.     During the Class Period, Defendant Benefits Committee had a fiduciary duty to do all of the following: ensure that the Plan's Total RKA fees were objectively reasonable; defray reasonable expenses of administering the Plan; and act with the care, skill, diligence, and prudence required by ERISA.

201.     During the Class Period, Defendant Benefits Committee breached their fiduciary duty of prudence to Plan participants, including to Plaintiffs, by failing to: ensure that the Plan's Total RKA fees were objectively reasonable, defray reasonable expenses of administering the Plan, and act with the care, skill, diligence, and prudence required by ERISA.

202.     During the Class Period, Defendant Benefits Committee further had a continuing duty to regularly monitor and evaluate the Plan's recordkeeper, Fidelity, to make sure it was providing the Total RKA services at reasonable costs, given the highly competitive, commodified market surrounding recordkeeping and the enormous bargaining power the Plan had to negotiate the best fees, and remove Fidelity if it provided recordkeeping services at objectively unreasonable levels.

203.     During the Class Period, Defendant Benefits Committee breached its duty to Plan participants, including to Plaintiffs, by failing to employ a prudent process and by failing to evaluate the cost of the Plan's recordkeeper critically or objectively in comparison to other recordkeeper options.

204.     Defendant Benefits Committee's failure to discharge its duties with respect to the Plan with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would have used in the conduct of an enterprise of like character and with like aims, breaching its duties under 29 U.S.C. § 1104(a)(1)(B).

205.     As a result of Defendant Benefits Committee's breach of fiduciary duty of prudence with respect to the Plan, the Plaintiffs and Plan participants suffered millions of dollars in objectively unreasonable and unnecessary monetary losses.

206.     Defendant Benefits Committee is liable under 29 U.S.C. §§ 1109(a) and 1132(a)(2) to make good to the AmerisourceBergen Plan the losses resulting from the breaches, to restore to the Plan any profits Defendants made through the use of Plan assets, and to restore to the Plan any profits resulting from the breaches of fiduciary duties alleged in this Count. In addition, Defendant Benefits Committee is subject to other equitable relief as set forth in the Prayer for Relief.

**SECOND CLAIM FOR RELIEF**
**Breaches of Duty of Prudence of ERISA, as Amended**
**(Plaintiffs, on behalf of themselves and Class,**
**Against Defendant Benefit Committee –**
**Stable Value Fund Fees)**

207.     Plaintiff restates the above allegations as if fully set forth herein.

208.    Defendant Benefit Committee, and its members, are fiduciaries of the Plan under 29 U.S.C. §§ 1002(21) and/or 1102(a)(1).

209.    29 U.S.C. § 1104(a)(1)(B) imposes a fiduciary duty of prudence upon Defendant Benefit Committee, and its members, in managing the investments of the Plan, including stable value funds.

210.    Defendant Benefit Committee, and its members, as fiduciaries of the Plan, are responsible for selecting prudent investment options, ensuring that those options charge only reasonable fees, and taking any other necessary steps to ensure that the Plan's assets are invested prudently.

211.    During the Class Period, Defendant Benefit Committee, and its members, had a fiduciary duty to do all of the following: manage the assets of the Plan prudently; defray reasonable expenses of administering the Plan; and act with the care, skill, diligence, and prudence required by ERISA.

212.    During the Class Period, Defendant Benefit Committee, and its members breached their fiduciary duties of prudence to Plan participants, including Plaintiff, by failing to manage the assets of the Plan prudently, defray reasonable expenses of administering the Plan, act with the care, skill, diligence, and prudence required by ERISA.

213.    Defendant Benefit Committee, and its members, as fiduciaries of the Plan, had a continuing duty to regularly monitor and independently assess whether the Plan's investments were prudent choices for the Plan and to remove imprudent investment options regardless of how long investments had been in the Plan.

214.    During the Class Period, Defendant Benefit Committee, and its members, breached their fiduciary duties of prudence to Plan participants, including Plaintiffs, by failing to engage in a prudent process for monitoring the Plan's investments and removing imprudent ones within a reasonable period.

215.    Defendants were directly responsible for ensuring that the Plan's investment management fees were reasonable, selecting investment options in a prudent fashion, prudently evaluating and monitoring the Plan's investments on an ongoing basis, eliminating the expensive stable value fund option that were unreasonable, and taking all necessary steps to ensure that the Plan's assets were invested prudently and appropriately.

216.    Defendant Benefit Committee, and its members, failed to employ a prudent process by failing to evaluate the cost of the Plan's investments critically or objectively in comparison to other more reasonable alternative investments. Defendant Benefit Committee, and its members, selected and retained for years as Plan investment options an unreasonable stable value fund when other materially identical investment options were readily available to the Plan at all relevant times.

217.    Defendant Benefit Committee, and its members', failure to discharge their duties with respect to the Plan with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would have used in the conduct of an enterprise of like character and with like aims, breaching its duties under 29 U.S.C. § 1104(a)(1)(B).

218.    These stable value fund allegations do not involve "reasonable tradeoffs" between differently managed investments. The higher-cost stable value fund selected and retained by Defendants were materially identical to alternative stable value fund products which are meaningful benchmarks to the Plan's stable value product.

219.    As a result of Defendant Benefit Committee, and its members', breach of their fiduciary duties of prudence with respect to the Plan, the Plaintiffs and Plan participants suffered unreasonable and unnecessary monetary losses in the millions of dollars.

220.    Defendant Benefit Committee, and its members, are liable under 29 U.S.C. §§ 1109(a) and 1132(a)(2) to make good to the Plan the losses resulting from the breaches, to restore to the Plan any profits they made through the use of Plan assets, and to restore to the Plan any profits resulting

from the breaches of fiduciary duties alleged in this Count. In addition, Defendant Benefit Committee, and its members, are subject to other equitable relief pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2)

### THIRD CLAIM FOR RELIEF
**Failure to Adequately Monitor Other Fiduciaries under ERISA, as Amended**
**(Plaintiffs, on behalf of themselves and Class, Against**
**Defendants AmerisourceBergen and Board – Total RKA Fees)**

221.    Plaintiffs restate the above allegations as if fully set forth herein.

222.    Defendants AmerisourceBergen and Board had the authority to appoint and remove members or individuals responsible for Plan Total RKA fees on the Benefits Committee and knew or should have known that these fiduciaries had critical responsibilities for the Plan.

223.    In light of this authority, Defendants AmerisourceBergen and Board had a duty to monitor those individuals responsible for Plan Total RKA fees on the Benefits Committee to ensure that they were adequately performing their fiduciary obligations, and to take prompt and effective action to protect the Plan in the event that these individuals were not fulfilling those duties.

224.    Defendants AmerisourceBergen and Board had a duty to ensure that the individuals responsible for Plan Total RKA fees possessed the needed qualifications and experience to carry out their duties (or use qualified advisors and service providers to fulfill their duties); had adequate financial resources and information; maintained adequate records of the information on which they based their decisions and analysis with respect to the Plan's Total RKA fees; and reported regularly to Defendant AmerisourceBergen and Board.

225.    The objectively unreasonable and excessive Total RKA fees paid by the Plan inferentially establish that Defendants AmerisourceBergen and Board breached their duty to monitor by, among other things:

        a.    Failing to monitor and evaluate the performance of individuals responsible for Plan Total RKA fees on the Benefits Committee or have a system in place for doing so, standing idly by as the Plan suffered significant losses in the form of objectively unreasonably Total RKA expenses;

b.      Failing to monitor the process by which the Plan's recordkeeper, Fidelity, was evaluated and failing to investigate the availability of more reasonably-priced recordkeepers; and

c.      Failing to remove individuals responsible for Plan Total RKA fees on the Benefits Committee whose performance was inadequate in that these individuals continued to pay the same Total RKA costs over numerous years even though solicitation of competitive bids would have shown that maintaining Fidelity as the recordkeeper at the contracted price was imprudent, excessively costly, all to the detriment of the Plaintiffs' and other Plan participants' retirement savings.

226.    As the consequences of the breaches of the duty to monitor for Total RKA fees the Plaintiffs and Plan participants suffered millions of dollars of objectively unreasonable and unnecessary monetary losses.

227.    Pursuant to 29 U.S.C. §§1109(a) and 1132(a)(2), Defendants AmerisourceBergen and Board are liable to restore to the AmerisourceBergen Plan all losses caused by their failure to adequately monitor individuals responsible for Plan Total RKA fees on the Benefits Committee.  In addition, Plaintiffs and the Class are entitled to equitable relief and other appropriate relief as set forth in the Prayer for Relief.

**FOURTH CLAIM FOR RELIEF**
**Failure to Adequately Monitor Other Fiduciaries under ERISA, as Amended**
**(Plaintiffs, on behalf of themselves and Class, Against Defendants**
**AmerisourceBergen and Board- Stable Value Fund Fees)**

228.    Plaintiff restates the above allegations as if fully set forth herein.

229.    Defendants AmerisourceBergen and Board had the authority to appoint and remove members or individuals responsible for Plan investment management fees and knew or should have known that these fiduciaries had critical responsibilities for the Plan.

230.    Defendants AmerisourceBergen and Board had a duty to monitor those individuals responsible for Plan investment management fees to ensure that they were adequately performing their fiduciary obligations, and to take prompt and effective action to protect the Plan in the event that these individuals were not fulfilling those duties.

231.    Defendants AmerisourceBergen and Board had a duty to ensure that the individuals responsible for Plan investments possessed the needed qualifications and experience to carry out their duties (or use qualified advisors and service providers to fulfill their duties); had adequate financial resources and information; maintained adequate records of the information on which they based their decisions and analysis with respect to the Plan's investments; and reported regularly to Defendants AmerisourceBergen and Board.

232.    The objectively unreasonable and excessive investment fees paid by the Plan in the form of excessive costs for stable value funds inferentially suggest that Defendants AmerisourceBergen and Board breached their duty to monitor by, among other things:

   a.    Failing to monitor and evaluate the performance of individuals responsible for Plan investment fees or have a system in place for doing so, standing idly by as the Plan suffered significant losses in the form of objectively unreasonable investment expenses;

   b.    Failing to monitor the process by which investment fees were evaluated and failing to investigate the availability of more reasonably-priced investment fees; and

   c.    Failing to remove individuals responsible for Plan investment fees whose performance was inadequate in that these individuals continued to pay the same investment costs even though further investigation would have shown that maintaining the selected stable value fund was imprudent, excessively costly, all to the detriment of the Plan and Plan participants' retirement savings.

233.    As a consequence of the foregoing breaches of the duty to monitor for investment fees, the Plaintiffs and Plan participants suffered millions of dollars of objectively unreasonable and unnecessary monetary losses.

234.    Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2), Defendants AmerisourceBergen and Board are liable to restore to the Plan all losses caused by their failure to adequately monitor individuals responsible for Plan investment fees. In addition, Plaintiffs are entitled to equitable relief and other appropriate relief as set forth in the Prayer for Relief.

WHEREFORE, Plaintiffs pray that judgment be entered against Defendants on all claims and requests that the Court award the following relief:

A.   A determination that this action may proceed as a class action under Rule 23(b)(1), or in the alternative Rule 23(b)(2), of the Federal Rules of Civil Procedure;

B.   Designation of Plaintiffs as Class Representatives and designation of Plaintiffs' counsel as Class Counsel;

C.   A Declaration that the Defendants are fiduciaries, have breached their fiduciary duty of prudence under ERISA, causing harm to Plan participants and beneficiaries;

D.   An Order compelling the Defendants to make good to the Plan all losses to the Plan resulting from Defendants' breaches of fiduciary duty, including restoring to the Plan all losses resulting from paying unreasonable Total RKA and stable value fund fees, and restoring to the Plan all profits the Defendants made through use of the Plan's assets, and restoring to the Plan all profits which the Participants would have made if the Defendants had fulfilled their fiduciary obligations;

E.   An Order requiring AmerisourceBergen to disgorge all profits received from, or in respect of, the Plan, and/or equitable relief pursuant to 29 U.S.C. § 1132(a)(3) in the form of an accounting for profits, imposition of constructive trust, or surcharge against AmerisourceBergen as necessary to effectuate relief, and to prevent AmerisourceBergen's unjust enrichment;

F.   An Order enjoining Defendants from any further violation of their ERISA fiduciary responsibilities, obligations, and duties;

G.   Other equitable relief to redress Defendants' illegal practices and to enforce the provisions of ERISA as may be appropriate, including appointment of an independent fiduciary/consultant or fiduciaries to run the Plan and removal of plan fiduciaries deemed to have breached their fiduciary duties;

H.   An award of pre-judgment interest;

I.   An award of attorneys' fees and costs pursuant to 29 U.S.C. § 1132(g) and the common fund doctrine; and

J.   Such other and further relief as the Court deems equitable and just.

Respectfully submitted,

**WALCHESKE & LUZI, LLC**

/s/ Paul M. Secunda
Paul M. Secunda*
* *Admitted Pro Hac Vice*
235 N. Executive Dr., Suite 240
Brookfield, Wisconsin 53005
Telephone: (414) 828-2372
psecunda@walcheskeluzi.com

**PAUL HERSHBERG LAW, PLLC**

Paul Hershberg
Kaden Tower, Suite 1100
6100 Dutchmans Lane
Louisville, Kentucky 40205
Telephone: 502-736-7040
Facsimile: 502-736-7510
paul@hershberglaw.com

*Attorneys for Plaintiffs and Proposed Class*

Date: October 6, 2023