**THE UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF KENTUCKY**
**LOUISVILLE DIVISION**

| | |
|---|---|
| KENNETH DUKES, MARK A. GALE, CHRISTINE CHAVIS, and DAVID R. FLY, individually, and as representatives of a class of Participants and Beneficiaries of the Amerisource-Bergen Corporation Employee Investment Plan,<br><br>        Plaintiffs,<br><br>        v.<br><br>AMERISOURCEBERGEN CORPORATION, BOARD OF DIRECTORS OF AMERISOURCEBERGEN CORPORATION, and AMERISOURCEBERGEN CORPORATION BENEFITS COMMITTEE,<br><br>        Defendants. | Case No. 3:23-CV-313-DJH-CHL |

**DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' AMENDED COMPLAINT AND**
**MEMORANDUM OF LAW IN SUPPORT**

# TABLE OF CONTENTS

**Page**

INTRODUCTION ..................................................................................................................... 1

BACKGROUND ...................................................................................................................... 3

I.      The Plan and Its Investment Options ............................................................................. 3

II.     The Plan's RKA Services and Fees. ............................................................................. 4

III.    Plaintiffs' Claims .......................................................................................................... 5

I.      Plaintiffs' Imprudent-Investment Claim Under Count II Should Be Dismissed ........... 6

      A.      Plaintiffs Lack Article III Standing to Pursue the Amended Complaint's Claim That the FMIP Was Imprudent ...................................................... 6

      B.      Plaintiffs' Imprudent Investment Allegations Are Implausible ......................... 9

              1.      Plaintiffs' Underperformance Allegations Cannot Create a Plausible Inference of Imprudence. ..................................................... 9

              2.      Plaintiffs' Underperformance Allegations Fail Because They Do Not Offer Meaningful Comparators for the Challenged Fund ................................... 12

II.     Plaintiffs' Excessive-RKA-Fee Claim in Count I Should Be Dismissed. .................... 16

      A.      Plaintiffs' Fee Comparisons Do Not Support an Inference That AB Lacked a Prudent Fiduciary Process .............................................................. 16

      B.      Plaintiffs' Fee Comparisons Fail Because They Do Not Account for Differing Types and Levels of Service Provided by Plan Recordkeepers. ..................... 18

      C.      Plaintiffs' Fee-Comparison Allegations Fail Because They Do Not Accurately Calculate the Total Fees Paid by the Comparator Plans. ................................ 22

III.    Plaintiffs' Derivative Claims in Counts III and IV Should Be Dismissed. .................. 25

CONCLUSION ...................................................................................................................... 25

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Albert v. Oshkosh Corp.*,
   47 F.4th 570 (7th Cir. 2022) ................................................................. 18, 19

*Anderson v. Advance Pubs., Inc.*,
   2023 WL 3976411 (June 13, 2023) ............................................................. 11

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) ...................................................................................... 6

*Ashland, Inc. v. Oppenheimer & Co.*,
   648 F.3d 461 (6th Cir. 2011) ........................................................................ 3

*Barber v. Bryant*,
   860 F.3d 345 (5th Cir. 2017) ........................................................................ 9

*Barchock v. CVS Health Corp.*,
   886 F.3d 43 (1st Cir. 2018) .......................................................................... 11

*Beldock v. Microsoft Corp*,
   2023 WL 3058016 (W.D. Wash. Apr. 24, 2023) .......................................... 10

*Bell Atlantic Corp. v. Twombly*,
   550 U.S. 544 (2007) ....................................................................................... 6

*Bracalente v. Cisco Syst., Inc.*,
   2023 WL 5184138 (N.D. Cal. Aug. 11, 2023) .............................................. 11

*Clapper v. Amnesty Int'l USA*,
   568 U.S. 398 (2013) ....................................................................................... 8

*Davis v. Wash. Univ. in St. Louis*,
   960 F.3d 478 (8th Cir. 2020) ....................................................................... 14

*Duncan v. Muzyn*,
   885 F.3d 422 (6th Cir. 2018) ......................................................................... 6

*England v. DENSO Int'l Am. Inc.*,
   2023 WL 4851878 (E.D. Mich. July 28, 2023) ........................... 1, 18, 19, 20

*Ferguson v. Ruane Cunniff & Goldfarb Inc.*,
   2019 WL 4466714 (S.D.N.Y. Sept. 18, 2019) .............................................. 17

*Fifth Third Bancorp v. Dudenhoeffer*,
   573 U.S. 409 (2014) ................................................................................. 6, 17

*Forman v. TriHealth, Inc.*,
    40 F.4th 443 (6th Cir. 2022) ........................................................ 10, 12, 13, 16

*Fritton v. Taylor Corp.*,
    2022 WL 17584416 (D. Minn. Dec. 12, 2022) ................................................ 22

*Goldenberg v. Indel, Inc.*,
    741 F. Supp. 2d 618 (D.N.J. 2010) ................................................................ 19

*Hall v. Cap. One Fin. Corp.*,
    2023 WL 2333304 (E.D. Va. Mar. 1, 2023) ................................................ 3, 11

*Harmon v. FMC Corp.*,
    2018 WL 1366621 (E.D. Pa. Mar. 16, 2018) .................................................. 25

*Hi-Lex Controls, Inc. v. Blue Cross Blue Shield of Mich.*,
    751 F.3d 740 (6th Cir. 2014) ........................................................................... 3

*Hughes Aircraft Co. v. Jacobson*,
    525 U.S. 432 (1999) ........................................................................................ 7

*Hughes v. Nw. Univ.*,
    595 U.S. 170 (2022) ........................................................................ 6, 9, 10, 11

*Jones v. Dish Network Corp.*,
    2023 WL 2644081 (D. Colo. Mar. 27, 2023) ................................................. 18

*Laboy v. Bd. Of Trs. Of Bldg. Serv.*,
    513 F. App'x 78 (2d Cir. 2013) ...................................................................... 11

*LaRue v. DeWolff, Boberg & Assocs.*,
    552 U.S. 248 (2008) ........................................................................................ 8

*In re LinkedIn ERISA Litig.*,
    2021 WL 5331448 (N.D. Cal. Nov. 16, 2021) ........................................... 8, 14

*Loren v. Blue Cross & Blue Shield of Mich.*,
    505 F.3d 598 (6th Cir. 2007) ....................................................................... 7, 8

*Luckett v. Wintrust Fin. Corp.*,
    2023 WL 4549620 (N.D. Ill. July 14, 2023) .................................................. 11

*Lujan v. Defenders of Wildlife*,
    504 U.S. 555 (1992) ........................................................................................ 6

*Lyshe v. Levy*,
    854 F.3d 855 (6th Cir. 2017) ........................................................................... 6

*Mateya v. Cook Grp. Inc.*,
    2023 WL 4608536 (S.D. Ind. June 16, 2023) .................................. 1, 18, 22, 23

*Matney v. Barrick Gold of N. Am.*,
  80 F.4th 1136 (10th Cir. 2023) ............................................................... 17, 18

*Mator v. Wesco Distrib., Inc.*,
  2022 WL 3566108 (W.D. Pa. Aug. 18, 2022) ................................................. 19

*Matousek v. MidAm. Energy Co.*,
  51 F.4th 274 (8th Cir. 2022) ................................................................... 18, 24

*Meiners v. Wells Fargo & Co.*,
  898 F.3d 820 (8th Cir. 2018) ........................................................................ 10

*Miller v. Packaging Corp. of Am.*,
  2023 WL 2705818 (W.D. Mich. Mar. 30, 2023) ...................................... *passim*

*Nicolas v. Trs. of Princeton Univ.*,
  2017 WL 4455897 (D.N.J. Sept. 25, 2017) ..................................................... 25

*Perkins v. United Surgical Partners Int'l Inc.*,
  2022 WL 824839 (N.D. Tex. Mar. 18, 2022) .................................................. 19

*Pfeil v. State St. Bank & Tr. Co.*,
  806 F.3d 377 (6th Cir. 2015) .......................................................................... 9

*Probst v. Eli Lilly & Co.*,
  2023 WL 1782611 (S.D. Ind. Feb. 3, 2023) ............................................... 1, 20

*Riley v. Olin Corp.*,
  2022 WL 2208953 (E.D. Mo. June 21, 2022) ................................................. 18

*Romero v. Nokia, Inc.*,
  2013 WL 5692324 (N.D. Cal. Oct. 15, 2013) ................................................. 25

*Saumer v. Cliffs Nat. Res. Inc.*,
  2016 WL 8668509 (N.D. Ohio Apr. 1, 2016) ................................................. 25

*Sigetich v. The Kroger Co.*,
  2023 WL 2431667 (S.D. Ohio Mar. 9, 2023) ........................................ 1, 19, 20

*Singh v. Deloitte LLP*,
  650 F. Supp. 3d 259 (S.D.N.Y. 2023) ........................................................... 23

*Smith v. CommonSpirit Health*,
  2021 WL 4097052 (E.D. Ky. Sept. 8, 2021) ............................................... 3, 15

*Smith v. CommonSpirit Health*,
  37 F.4th 1160 (6th Cir. 2022) .............................................................. *passim*

*Spokeo, Inc. v. Robins*,
  578 U.S. 330 (2016) ...................................................................................... 7

*Thole v. U.S. Bank N.A.*,
   140 S. Ct. 1615 (2020) ...................................................................................... 7

*TransUnion LL v. Ramirez*,
   141 S. Ct. 2190 (2021) ...................................................................................... 8

*WCI, Inc. v. Ohio Dep't of Pub. Safety*,
   18 F.4th 509 (6th Cir. 2021) ............................................................................. 9

*Wehner v. Genentech, Inc.*,
   2021 WL 507599 (N.D. Cal. Feb. 9, 2021) ................................................ 14, 22

*White v. Chevron Corp.*,
   2016 WL 4502808 (N.D. Cal. Aug. 29, 2016) ................................................ 19

*Yost v. First Horizon Nat'l Corp.*,
   2011 WL 2182262 (W.D. Tenn. June 3, 2011) .................................................. 7

*Young v. Gen. Motors Inv. Mgmt. Corp.*,
   325 F. App'x 31 (2d Cir. 2009) ....................................................................... 18

**Statutes**

Employee Retirement Income Security Act of 1974 ("ERISA"),
   29 U.S.C. § 1001, et seq. ......................................................................... *passim*

**Rules**

Fed. R. Civ. P. 12(b)(1) ............................................................................... *passim*

Fed. R. Civ. P. 12(b)(6) ............................................................................... *passim*

**Other Authorities**

U.S. Dep't. of Labor, *Understanding Retirement Plan Fees and Expenses* (Sept. 2021), *available at*
   https://www.dol.gov/sites/dolgov/files/ebsa/about-ebsa/our-activities/resource-
   center/publications/understanding-retirement-plan-fees-and-expenses.pdf
   .................................................................................................................... 4

U.S. Dep't. of Labor, *A Look at 401(k) Plan Fees* (Sept. 2019), *available at*
   https://www.dol.gov/sites/dolgov/files/ebsa/about-ebsa/our-activities/resource-
   center/publications/a-look-at-401k-plan-fees.pdf ...................................... 20, 21

Defendants AmerisourceBergen Corporation, the Board of Directors of the AmerisourceBergen Corporation, and the AmerisourceBergen Benefits Committee (together, "Defendants," "AmerisourceBergen," or "AB"), respectfully move the Court to dismiss Plaintiffs' Amended Complaint under Rules 12(b)(1) and (6).

## INTRODUCTION

As part of a recent deluge of copycat class actions, Plaintiffs filed a complaint alleging the fiduciaries of the AmerisourceBergen Corporation ("AB") Employee Investment Plan ("Plan") breached their duty of prudence under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001, et seq.  Plaintiffs claimed the Plan's fiduciary committee failed to prudently monitor the fees the Plan paid for necessary recordkeeping and administrative ("RKA") services, because those fees allegedly exceeded the RKA fees paid by some other plans.  As the AB defendants showed in their motion to dismiss (Dkt. 14), Plaintiffs' claim failed for the same reasons other courts in the Sixth Circuit have dismissed materially identical claims brought by Plaintiffs' same counsel, including that a plaintiff cannot state a claim under ERISA by simply comparing alleged expenses of one plan to those of other plans.[1]

Rather than respond, Plaintiffs filed an Amended Complaint.  Dkt. 16 ("Am. Compl.").  In their new complaint, Plaintiffs still allege the Plan's RKA fees were "excessive," but they have abandoned 12 of the "comparator" plans they previously used to support this theory, and now identify just six such plans.  Beyond watering down their RKA-fee allegations, Plaintiffs have also added a new claim alleging that one of the Plan's investments—the Fidelity Managed Income Portfolio II (the "FMIP")—was "imprudent" because it provided smaller returns than other "stable

---

[1] See, e.g., Sigetich v. The Kroger Co., 2023 WL 2431667 (S.D. Ohio Mar. 9, 2023); Miller v. Packaging Corp. of Am., 2023 WL 2705818 (W.D. Mich. Mar. 30, 2023); England v. DENSO Int'l Am. Inc., 2023 WL 4851878 (E.D. Mich. July 28, 2023); Probst v. Eli Lilly & Co., 2023 WL 1782611 (S.D. Ind. Feb. 3, 2023); Mateya v. Cook Grp. Inc., 2023 WL 4608536 (S.D. Ind. June 16, 2023).

value" products available in the market between 2017 and 2022.  The Amended Complaint should be dismissed under Rules 12(b)(1) and 12(b)(6) for the following reasons.

*First*, Plaintiffs lack Article III standing to pursue their new imprudent-investment claim. Just one of the Plaintiffs, Mark Gale, invested in the FMIP.  However, Gale did not invest in the fund until October 5, 2023—just *one day* before his lawyer filed the Amended Complaint—when he elected to transfer a small portion of his Plan holdings into the FMIP in a transparent attempt to manufacture standing to challenge it.  Thus, because Gale did not invest in the FMIP between 2017 and 2022, he could not have suffered any financial injury from the allegedly subpar returns that Plaintiffs complain about in those years.  Plaintiffs might speculate that the FMIP will underperform in the *future*, but they do not make any such allegations, and, regardless, alleging a potential future injury is insufficient to establish Article III standing.

*Second*, even if Plaintiffs had standing, their FMIP claim would still fail.  Whether fiduciaries fulfilled their duty to make a prudent investment decision does not turn on the *outcome* of the investment, but rather the *process* used to make that decision.  *Smith v. CommonSpirit Health*, 37 F.4th 1160, 1166-67 (6th Cir. 2022).  Thus, a plaintiff cannot state a viable claim by "simply pointing to a fund with better performance." *Id*. at 1166.  Instead, he must plausibly allege that the challenged fund severely underperformed a "meaningful benchmark" (*i.e.*, another investment with the same "investment strategy," "objectives," and "risk profile"), and exhibited other "serious signs of distress," such that any prudent fiduciary would have promptly removed the fund from the plan.  *Id*. at 1167-68.  Plaintiffs have offered nothing of the kind.  For these additional reasons, Plaintiffs' imprudent investment claim in Count II should be dismissed.

*Third*, Plaintiffs' claim that Defendants failed to monitor the Plan' RKA fees is a shell of the one asserted in their original complaint, and it fails for all the same reasons.  For this claim,

Plaintiffs must plausibly allege that the Plan's RKA "fees were excessive *relative to the services rendered*." *CommonSpirit Health*, 37 F.4th at 1169 (emphasis added).  They have not done that.  Instead, Plaintiffs merely allege that all recordkeeping service providers *can* provide the same range of RKA services, and thus all plans must *receive* the same services.  As multiple courts have already recognized, this logical fallacy cannot satisfy Plaintiffs' pleading burden.  Equally problematic, Plaintiffs have abandoned their allegation that seventeen other plans paid lower RKA fees than the Plan here, and now identify just six that supposedly paid less.  However, the same documents on which Plaintiffs base their claim contradict their allegations about how much those six plans paid, and thus their RKA-fee claim fails.

For these reasons and as discussed further below, the Amended Complaint should be dismissed with prejudice under Rules 12(b)(1) and 12(b)(6).

## BACKGROUND[2]

### I.     The Plan and Its Investment Options.

The Plan is a defined-contribution plan under ERISA, 29 U.S.C. § 1002(34).  Am. Compl. ¶ 2.  AB sponsors the Plan and appoints the Benefits Committee ("Committee") members who manage the Plan.  *Id.* ¶¶ 3-4, 48-49, 197-200.  The Plan offers a diverse menu of between 17 and 18 investment options (depending on the year), plus a suite of target-date funds,[3] in which

---

[2] This section includes factual background based on the Amended Complaint's allegations and the publicly available "Form 5500" documents referenced therein, which the Court may properly consider at the pleadings stage.  *See, e.g.*, *Ashland, Inc. v. Oppenheimer & Co.*, 648 F.3d 461, 467 (6th Cir. 2011) (considering documents referenced in support of allegations in complaint); *Hi-Lex Controls, Inc. v. Blue Cross Blue Shield of Mich.*, 751 F.3d 740, 746 n.8 (6th Cir. 2014) (considering Forms 5500 because they are publicly available governmental filings); *Smith v. CommonSpirit Health*, 2021 WL 4097052, at *9 (E.D. Ky. Sept. 8, 2021), *aff'd*, 37 F.4th 1160 (6th Cir. 2022) (considering ERISA plan fee disclosures).

[3] "A target date fund ('TDF') is an investment vehicle that offers an all-in-one retirement solution through a portfolio of underlying funds that gradually shifts to become more conservative as the assumed target retirement year approaches."  *Hall v. Cap. One Fin. Corp.*, 2023 WL 2333304, at *1 (E.D. Va. Mar. 1, 2023), *appeal dismissed*, No. 23-1357, 2023 WL 6388629 (4th Cir. May 12, 2023).

participants can choose to invest their plan contributions on a tax-deferred basis. *Id*. ¶¶ 1-3; *see also* Ex. 1, Excerpts from AB Plan 2018 Form 5500, Fin. Stmts, at 13.

Plaintiffs allege that one of the Plan's investment options—a stable value fund managed by Fidelity and referred to herein as the FMIP—was an "imprudent" investment. Like other stable-value funds, which are "common in 401(k) plans," the FMIP provides liquidity, principal protection, and guarantees positive investment returns each year. Am. Compl. ¶¶ 154-56. More specifically, the FMIP uses a guaranteed investment contract, or "GIC," to guarantee stable annual returns for participants known as the "crediting rate." *Id.* Between 2017 and 2022, the FMIP provided annualized crediting rates, *net of fees*, that ranged from 1.74% to 2.51%. *Id.* ¶ 165. Only one of the four Plaintiffs (Mark Gale), invested in the FMIC, but, notably, did not do so until October 5, 2023,[4] just one day before the Amended Complaint was filed.

## II.    The Plan's RKA Services and Fees.

The Plan engages Fidelity Investments ("Fidelity"), a "national retirement plan services provider," to provide certain recordkeeping and administrative, or "RKA," services to the Plan. Am. Compl. ¶¶ 6, 53. As the U.S. Department of Labor ("DOL") explains, RKA services can include both (1) basic services necessary to the daily operation of the plan, such as "recordkeeping, accounting, legal and trustee services," and (2) "a host of additional services, such as telephone voice response systems, access to customer service representative[s], educational seminars, retirement planning software, investment advice, electronic access to plan information, daily valuation, and online transactions," among other services.[5]

---

[4]  Declaration of Kimberly Kirkpatrick ("Kirkpatrick Decl.") at ¶¶ 4-5.

[5]  See DOL, Understanding Retirement Plan Fees and Expenses at 2 (Sept. 2021), available at https://www.dol.gov/sites/dolgov/files/ebsa/about-ebsa/our-activities/resource-center/publications/understanding-retirement-plan-fees-and-expenses.pdf (last visited Nov. 20, 2023).

The Amended Complaint divides the RKA services Fidelity offers into three categories. First, it alleges Fidelity offers "bundled" services, including recordkeeping, transaction processing, administrative services, participant communications, tracking account balances, overseeing investment elections, processing transactions, and customer service support. Am. Compl. ¶¶ 57-58. Second, it alleges that Fidelity offers various "a la carte" services that individual participants can elect to receive for additional fees, including, among others, individual loan processing, brokerage-account services, benefit-distribution services, and qualified-domestic-relations-order ("QDRO") services. *Id*. ¶¶ 66-67. And third, it alleges Fidelity offers "ad hoc" services, which carry their own unique fees. *Id*. ¶ 68.

According to the Amended Complaint, the Plan paid a flat rate for "bundled" RKA services of $48 per participant in 2017-21, $42 in 2022, and $36 in 2023. Am. Compl. ¶ 61. The Amended Complaint also estimates, based on the Plan's public Form 5500 filings, that the Plan paid, on average, $12.50 per participant for the "a la carte" and "ad hoc" services. *Id*. ¶ 70. Despite these allegations, which would suggest combined fees ranging from $60.50 per participant in 2017 to $48.50 per participant in 2023, the Amended Complaint later presents a chart "estimating" that the Plan's fees ranged from $59 to $63, on average, per participant since 2017. *Id*. ¶ 102. The chart does not include any fee data for 2023, when the Plan's flat rate was reduced from $42 to $36 per participant. *Compare id.* ¶ 102 *with id.* ¶ 61.

### III.   Plaintiffs' Claims.

Plaintiffs bring four claims. In Count I, they claim the Committee breached its fiduciary duty of prudence, 29 U.S.C § 1104(a)(1)(B), by failing to prudently monitor the Plan's RKA fees. Am. Compl. ¶¶ 196-206. In Count II, Plaintiffs claim the Committee breached its duty of prudence by failing to monitor the FMIP. *Id.* ¶¶ 207-220. In Counts III and IV, Plaintiffs claim AB and its Board of Directors failed to adequately monitor the Committee. *Id.* ¶¶ 221-234.

5

**LEGAL STANDARD**

*Rule 12(b)(1)*.  Article III limits federal court jurisdiction to "Cases" and "Controversies." U.S. Const. art. III, § 2, cl. 1. There can be no case or controversy if a plaintiff lacks standing to sue. *See Duncan v. Muzyn*, 885 F.3d 422, 427 (6th Cir. 2018).  Article III "constitutional" standing requires the plaintiff to have suffered an injury in fact that is fairly traceable to the defendant's action and is able to be redressed by a favorable decision. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992). Where the plaintiff lacks standing, a court must dismiss the complaint for lack of subject-matter jurisdiction. *Lyshe v. Levy*, 854 F.3d 855, 857 (6th Cir. 2017).

*Rule 12(b)(6)*.  In assessing ERISA claims of fiduciary breach under Rule 12(b)(6), courts must apply the pleading standards described in *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), and *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007).  In ERISA class actions, like this one, a motion to dismiss is an "important mechanism for weeding out meritless claims." *Fifth Third Bancorp v. Dudenhoeffer*, 573 U.S. 409, 425 (2014).  In evaluating "duty of prudence" claims, the question is whether the fiduciary process used to arrive at a challenged decision was reasonable—regardless of how the decision panned out.  *Smith*, 37 F.4th at 1166.  In all events, because ERISA fiduciaries will often face "difficult tradeoffs" when making plan-related decisions, the Court "must give due regard to the range of reasonable judgments a fiduciary may make based on her experience and expertise," under "the circumstances prevailing at the time."  *Hughes v. Nw. Univ.*, 595 U.S. 170, 177 (2022) (citation omitted).

**ARGUMENT**

I.   **Plaintiffs' Imprudent-Investment Claim Under Count II Should Be Dismissed.**

A.   **Plaintiffs Lack Article III Standing to Pursue the Amended Complaint's Claim That the FMIP Was Imprudent.**

As a threshold matter, the Court should dismiss Count II under Rule 12(b)(1), because

6

Plaintiffs lack constitutional standing to pursue their claim regarding the FMIP.

"There is no ERISA exception to Article III" standing and its requirements. *Thole v. U.S. Bank N.A.*, 140 S. Ct. 1615, 1622 (2020). Under those requirements, a plaintiff must show that he "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). The injury-in-fact element requires a plaintiff to have "suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Id*. at 339 (citation omitted). "Merely because [p]laintiffs claim that they are suing on behalf of their respective ERISA plan[] does not change the fact that they must also establish individual standing." *Loren v. Blue Cross & Blue Shield of Mich.*, 505 F.3d 598, 608–09 (6th Cir. 2007). Thus, "[a]n individual plan participant asserting a § 502(a)(2) claim on behalf of an ERISA plan must still demonstrate an actual individual injury to the participant's interests in the plan. Otherwise, Article III will not permit a plan participant who has suffered no injury in fact from suing to enforce ERISA fiduciary duties on behalf of the Plan." *Yost v. First Horizon Nat'l Corp.*, 2011 WL 2182262, at *6 (W.D. Tenn. June 3, 2011) (citation omitted).

Plaintiffs lack Article III standing to assert a claim challenging the FMIP because they suffered no injury related to the fund. The Plan is a defined-contribution, individual-account plan. Am. Compl. ¶ 2. This means that a participant's benefit is based solely on the amount held in his individual account. *Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432, 439 (1999). Naturally, then, the performance or fees of an investment the participant did not select cannot reduce the value of the participant's benefit because they have no impact on the amount of money held in the participant's individual plan account. For these reasons, following the Supreme Court's decision in *Thole*, "district courts across the country have largely held that ERISA plaintiffs do not have

standing to challenge the offering of specific funds that they did not allege that they personally invested in." *In re LinkedIn ERISA Litig.*, 2021 WL 5331448, at *4 (N.D. Cal. Nov. 16, 2021) (collecting cases).

The Amended Complaint alleges that Plaintiff Gale alone invested in the FMIP. Am. Compl. ¶ 36.[6] But a closer look at Gale's Plan investments reveals that he, too, lacks Article III standing to challenge the FMIP. Since at least 2017, Gale invested the entirety of his Plan account in the Fidelity Freedom Blend Target Date 2050 Fund—an option the Amended Complaint does not challenge. Kirkpatrick Decl. ¶ 5. It was not until October 5, 2023, one day before his lawyer filed the Amended Complaint, that Gale elected to transfer $1,000 of his account holdings to the FMIP. *Id*. Since Gale did not invest in the FMIP in 2017-2022, when the Amended Complaint alleges the fund provided subpar returns, he could not have suffered any Article III injury resulting from those returns. *See LaRue v. DeWolff, Boberg & Assocs.*, 552 U.S. 248, 256 (2008) (confirming that ERISA "authorize[s] recovery for fiduciary breaches that impair the value of plan assets in a participant's individual account").

Maybe Gale worries that he will sustain such an injury *in the future*, though the Amended Complaint does not say that.[7] And even if it did, "allegations of possible future injury are not sufficient" to demonstrate an injury in fact under Article III. *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (citation omitted); *TransUnion LL v. Ramirez*, 141 S. Ct. 2190, 2211 (2021) ("mere risk of future harm, standing alone, cannot qualify as a concrete harm" for Article III

---

[6] The three other Plaintiffs do not allege that they invested in the FMIP, and thus lack Article III standing to challenge it as well. *See, e.g.*, *Loren*, 505 F.3d at 608–09; *In re LinkedIn Litig.*, 2021 WL 5331448, at *4 (collecting cases).

[7] The Amended Complaint offers no allegations about the FMIP's performance from October 5, 2023, going forward. Nor could it. Plaintiff Gale was invested in the fund for only *one day* before the Amended Complaint was filed, and could not possibly offer any allegations about the fund's performance during that 24-hour period, let alone allegations that would support an imprudence claim.

purposes); *WCI, Inc. v. Ohio Dep't of Pub. Safety*, 18 F.4th 509, 515 (6th Cir. 2021) ("The hypothetical threat of some future harm, even a likely future harm, is not an injury-in-fact.").  More likely, Gale chose to invest in the FMIP in hopes of "manufactur[ing]" an injury "for the purpose of litigation," but that cynical tactic would not change the analysis in his favor.  *Barber v. Bryant*, 860 F.3d 345, 354 (5th Cir. 2017).  The Court should dismiss Count II under Rule 12(b)(1).

**B.    Plaintiffs' Imprudent Investment Allegations Are Implausible.**

In any event, Plaintiffs' FMIP allegations do not state a plausible claim under ERISA.  To do so, Plaintiffs must allege facts plausibly showing the Committee failed to act "with the care, skill, prudence, and diligence under the circumstances then prevailing" that a prudent person would use.  29 U.S.C. § 1104(a)(1)(B).  This "prudent person" test focuses on the fiduciary's *process* in arriving at a decision, not the *results* of the decision.  *Pfeil v. State St. Bank & Tr. Co.*, 806 F.3d 377, 384-85 (6th Cir. 2015).  Plaintiffs must *either* allege facts directly challenging the Committee's process, *or* facts from which the Court can reasonably *infer* the process was imprudent.  *See CommonSpirit*, 37 F.4th at 1165.  Here, Plaintiffs take the latter approach, but their efforts fail for the reasons discussed below.

**1.    Plaintiffs' Underperformance Allegations Cannot Create a Plausible Inference of Imprudence.**

To start, the Amended Complaint does not include any well-pled allegations to show that offering the FMIP as an investment option in the Plan was outside the "range of reasonable judgments" that other plan fiduciaries make.  *Hughes*, 595 U.S. at 177.  In other words, the Amended Complaint does not allege that a reasonable fiduciary could not have continued offering the FMIP as an investment option for their plan participants.  Nor could it.  The FMIP continues

to have $18.8 billion in assets under management as of September 30, 2023.[8]  This judicially noticeable fact demonstrates that other prudent investors have determined that the fund is well within the "range of reasonable" prudent investments.  *Id.*

Further, Plaintiffs' allegation that the FMIP produced slightly lower returns than some other stable-value products does not allow any plausible inference of imprudence.  The Sixth Circuit has repeatedly held that nothing in ERISA requires a fiduciary to pick the best performing fund, and thus allegations that another "similar" investment happened to perform better cannot state a viable claim under ERISA.  *See CommonSpirit*, 37 F.4th at 1166 (affirming dismissal of imprudent-investment claims comparing performance of plan's target-date funds to alternative funds available in the market, because "showing of imprudence [does not] come down to simply pointing to a fund with better performance"); *Forman v. TriHealth, Inc.*, 40 F.4th 443, 449 (6th Cir. 2022) (same). In *Forman*, the Sixth Circuit elaborated on the reasoning behind these holdings:

> Disappointing performance in the near term and higher costs do not by themselves show "deficient decision-making," especially when we account for competing explanations and other common sense aspects of long-term investments.  Different services, investment strategies, and investor preferences invariably lead to a spectrum of options—and in turn a spectrum of reasonable fee structures and performance outcomes.  As a result, side-by-side comparisons of how two funds performed in a narrow window of time, with no consideration of their distinct objectives, will not tell a fiduciary which is the more prudent long-term investment option.

40 F.4th at 449 (citation omitted).  Consistent with the Sixth Circuit's position, "courts across the country have rejected claims for breach of the fiduciary duty of prudence under ERISA where the plaintiffs allege nothing more than underperformance relative to other investment vehicles." *Beldock v. Microsoft Corp*, 2023 WL 3058016, at *3 (W.D. Wash. Apr. 24, 2023) (collecting cases).[9]

---

[8] Ex. 2, FMIP Fact Sheet (Sept. 30, 2023), at 1.

[9] *See also, e.g.*, *Meiners v. Wells Fargo & Co.*, 898 F.3d 820, 822-23 (8th Cir. 2018) (affirming dismissal

This conclusion is particularly appropriate here. As Plaintiffs acknowledge, the FMIP is a stable-value fund. These funds come in all sorts of different shapes and sizes, and their general purpose is to provide investors with an investment that protects their principal and provides modest, reliable returns that are greater than those of a money-market fund. *See Barchock v. CVS Health Corp.*, 886 F.3d 43, 49-54 (1st Cir. 2018) (describing different types of stable value funds that seek to outperform money-market returns). There is no allegation that the FMIP failed to do that. To the contrary, Plaintiffs merely allege that another stable-value fund available in the market might have provided larger returns, without accounting for the different strategies, risks, or contractual restrictions those funds impose on investors to achieve such returns. Thus, for the same reasons the Sixth Circuit explained in *Forman* above, naked comparisons to the returns of other stable-value funds do not support a plausible inference that the Plan fiduciaries here were imprudent to offer the FMIP—particularly when a large swath of the market has chosen to invest over $18 billion in that same fund. *See Barchock*, 886 F.3d at 52-53 (absent allegations that the fund failed to meet the objective of preserving capital, underperformance could not "support a plausible claim that" the fiduciary's "decision-making was imprudent.").

In short, nothing in the Amended Complaint supports a plausible inference that the Plan fiduciaries acted outside the "range of reasonable judgments a fiduciary may make" by offering the FMIP in the Plan. *Hughes*, 595 U.S. at 177. This is because allegations that other investments

---

based on allegations that other "target date funds" performed better than those offered in the plan); *Barchock*, 886 F.3d at 49-52 (affirming dismissal of claims alleging stable value fund was imprudent based on allegations that its returns were lower than those provided by other stable value products); *Laboy v. Bd. Of Trs. Of Bldg. Serv.*, 513 F. App'x 78, 79-80 (2d Cir. 2013) ("It is well-established that allegations of poor results alone do not constitute allegations sufficient to state a claim for such a breach."); *Bracalente v. Cisco Syst., Inc.*, 2023 WL 5184138, at *4 (N.D. Cal. Aug. 11, 2023) (dismissing imprudent investment claim because "the case law teaches that underperformance *alone* cannot substantiate an ERISA imprudence claim" ); *Luckett v. Wintrust Fin. Corp.*, 2023 WL 4549620, at *4 (N.D. Ill. July 14, 2023) (similar); *Anderson v. Advance Pubs., Inc.*, 2023 WL 3976411, at *4 (June 13, 2023) (similar); *Hall*, 2023 WL 2333304, at *6 (similar).

performed better are generally insufficient to state an imprudent investment claim under ERISA. *See CommonSpirit*, 37 F.4th at 1166; *Forman*, 40 F.4th at 448–49.  Plaintiffs' claim should be dismissed under this general rule—a conclusion that is only reinforced upon closer examination of Plaintiffs' performance allegations in the section below.

### 2.   Plaintiffs' Underperformance Allegations Fail Because They Do Not Offer Meaningful Comparators for the Challenged Fund.

Although the Sixth Circuit has held that performance comparisons generally cannot support a viable imprudent-investment claim, it has described the sort of allegations that might suffice. *CommonSpirit*, 37 F.4th at 1166-68.  Specifically, a plaintiff must allege *both* that the challenged investment underperformed a "meaningful benchmark," *and* exhibited "serious signs of distress," such that any prudent fiduciary would have "precipitously" dumped it from the plan. *Id.*  Critically, to plausibly allege a "meaningful benchmark," a plaintiff must identify alternative investment options with the same "investment strategy," "risk profile," and "objective" as the challenged fund. *Id.* at 1167-68.  In other words, a plaintiff must plausibly allege that, apart from performance, the identified "alternatives were otherwise *equivalent*" to the challenged fund. *Forman*, 40 F.4th at 449 (emphasis added).  While the Sixth Circuit has acknowledged that these requirements put plaintiffs in a "deep hole" when trying to plead an imprudent investment claim, it explained that this was a necessary consequence of Congress "establish[ing] a cause of action premised on a duty of prudence." *Id.* at 1168.  Ultimately, the Sixth Circuit held that the plaintiffs in *CommonSpirit* and *Forman* had come nowhere close to satisfying these requirements, because they had alleged only that a plan's "target date funds" underperformed some alternative "target date funds," without demonstrating that the alternatives were "meaningful benchmarks" or that challenged funds faced "serious signs of distress" that would have compelled any prudent fiduciary to remove them. *See CommonSpirit*, 37 F.4th at 1166-68; *Forman*, 40 F.4th at 448-49.

12

Plaintiffs' allegations here are no better.  To start, Plaintiffs do not even try to allege that the FMIP exhibited any "signs of distress."  This makes their allegations even more cursory than those of the plaintiffs in *CommonSpirit*, who at least tried to make that showing by offering various "red flags," including that other investors were divesting from the challenged funds during the class period.  Plaintiffs have not and cannot make any similar allegation, and, as already discussed, investors had poured over $18 billion into the FMIP as of September 30, 2023.

Plaintiffs instead base their claim entirely on allegations that the FMIP provided smaller returns than other stable-value products.  Am. Compl.  ¶¶ 161-82.  But these allegations are no different than those rejected in *CommonSpirit* and *Forman*, where the plaintiffs alleged that a plan's "target date funds" were imprudent because some other "target date funds" provided larger returns.  The mere fact that another investment in the same general category performed better is insufficient as a matter of law to state a plausible claim for relief.  Plaintiffs offer nothing more.

**First**, Plaintiffs compare the FMIP's returns to the average returns of the Morningstar US CIT Stable Value Index ("MSVI").  The MSVI, however, is not an investment alterative; rather, it is an index that "measures the performance of approximately 75% of the U.S. collective investment trust stable-value fund pooled universe."  Am. Compl. ¶ 163.  "The MSVI is equally weighted[,] which means that as long as the performance of the 75% of the U.S. collective trust stable-value fund universe was not virtually identical, then roughly 50% of the funds in the universe outperformed the index."  *Id.* ¶ 164.[10]  Plaintiffs allege the FMIP underperformed the MSVI average, and thus fell in the bottom half of the index, for several years.  *Id.*  ¶ 165.

---

[10] According to the Amended Complaint, then, the other 50% of the individual funds in the MSVI necessarily *underperformed* the index.  In other words, Plaintiffs allege that the FMIP performed in line with 50% of the funds that make up the Amended Complaint's own alleged index benchmark.  That is not sufficient to support an imprudence claim.

However, courts have repeatedly held that pointing to a market index, like the MSVI, cannot satisfy the "meaningful benchmark" requirement because a market index is not an investable alternative and cannot be equivalent to any particular investment in all material respects. *See In re LinkedIn ERISA Litigation*, 2021 WL 5331448, at *9 (granting 12(b)(6) motion to dismiss claim that fund underperformed market index because the market index is not a meaningful benchmark); *Davis v. Wash. Univ. in St. Louis*, 960 F.3d 478, 485 n.4 (8th Cir. 2020) (finding that a market index listed in the ERISA plan's disclosures was not a meaningful benchmark for a breach of fiduciary duty claim because the index "is not a fund, much less an actively managed one"); *Wehner v. Genentech, Inc.*, 2021 WL 507599, at *10 (N.D. Cal. Feb. 9, 2021) (similar).  Because the MSVI is not an investible option like the FMIP, it cannot be a meaningful benchmark for the FMIP.

Plaintiffs' comparison to the MSVI is also meaningless—and misleading—for another reason.  Although the Amended Complaint does not mention it, publicly available information shows that the MSVI reflects stable-value returns *gross* of fees.[11]  And the Amended Complaint compares the average of those *gross* returns to the FMIP's returns *net* of fees.  Because fees directly reduce an investment fund's returns, this is a classic apples-to-oranges comparison, which has the effect of inflating the MSVI returns while discounting the FMIP's returns.  To illustrate, the table below compares the *net* returns of the FMIP to the *net* and *gross* returns of the Putnam Stable Value Fund, which is the third-largest fund within the MSVI index.[12]

---

[11] Ex. 3, Construction Rules for the Morningstar US CIT Stable Values Indexes, at 3-4 (explaining that the index reports returns "gross of stable-value management fees").

[12] Ex. 4, MSVI Holdings (Sept. 30, 2023), at 1 (reporting that the third largest fund in the index was the Putnam Stable Value Fund with $14.97 billion in assets under management).

| | FMIP Net Returns | Putnam Net Returns[13] | Putnam Gross Returns[14] |
|---|---|---|---|
| 2017 | 1.62% | 1.18% | 2.18% |
| 2018 | 1.92% | 1.48% | 2.48% |
| 2019 | 2.24% | 1.68% | 2.68% |
| 2020 | 1.97% | 1.66% | 2.66% |
| 2021 | 1.32% | 1.45% | 2.45% |
| 2022 | 1.40% | 1.62% | 2.62% |

As the table demonstrates, accounting for fees, the FMIP provided *larger* returns than the Putnam in four of the six years at issue. Considering that the Putnam fund's gross returns were *higher* than the MSVI average, the table also demonstrates that the MSVI average would be significantly *lower* if it were based on net returns. *See CommonSpirit Health*, 2021 WL 4097052, at *8 (dismissing claims where challenged fund outperformed comparator in some years). In any event, Plaintiffs' allegation that the FMIP's *net* returns were lower than the average *gross* returns of funds in the MSVI cannot support a plausible inference that the FMIP returns were inferior to those of any fund in the MSVI, let alone funds that might constitute a meaningful benchmark.

**Second**, Plaintiffs allege that the *net* returns of the FMIP were smaller than the *net* returns of the T. Rowe Price Stable Value N (note, this shows Plaintiffs are aware of the critical difference between net and gross returns, which they failed to make in their comparison above). Plaintiffs allege the T. Rowe Price fund "follow[s] a similar investment strategy" and "invest[s] in similar vehicles" as the FMIP. Am. Compl. ¶¶ 167-68. But a plaintiff cannot satisfy the "meaningful benchmark" requirement merely by alleging an alternative that was, in some respect, "similar" to the challenged fund. *See CommonSpirit*, 37 F.4th at 1167 (rejecting comparison to other funds in

---

[13] The Putnam fund's "net" returns for 2017 through 2022 are reported in the fund's publicly available Q2 2023 Fact Sheet. The "net" returns reflect the fund's gross returns reduced by the fund's 1.00% management fee and other administrative fees. *See* Ex. 5, Putnam Stable Value Fund Fact Sheet (Q2 2023), at 3.

[14] The Putnam fund's "gross" returns are calculated by adding back the fund's 1.00% management fee to the fund's annual "net" returns for each year reported in the fund's Q2 2023 Fact Sheet.

the same "target date fund" category, even though they were "managed by the same [investment] team" at Fidelity and used "a similar allocation of investment types").  Instead, Plaintiffs must plausibly allege that, apart from performance, the FMIP and the T. Rowe Price fund are "otherwise equivalent" to one another.  *Forman*, 40 F.4th at 449.  Plaintiffs' conclusory allegations that the T. Rowe Price Fund was "similar" to the FMIP do not suffice.  "Even comparator investments that are sponsored by the same company, managed by the same team, and use a similar allocation of investment types will be inapt when each fund has distinct goals and distinct strategies."  *Forman,* 40 F.4th at 449 (citation omitted).  That is the case here.

Plaintiffs do not allege the T. Rowe Price fund is "otherwise equivalent" to the FMIP because they cannot.  For example, Plaintiffs claim the two funds "invest in similar vehicles," but they allege *no facts* in support.  That is because the funds invest in very *different* investment vehicles:  The FMIP invests in "short-term bonds and other fixed-income securities . . . and derivative instruments, including futures, options, and swaps,"[15] while the T. Rowe Price fund invests in other stable value products.[16]  This shows not only that the two funds utilize different investment vehicles, but also that they employ different strategies to generate their returns.  In short, Plaintiffs have done nothing more than compare the FMIP to another fund in the broad "stable value" category.  Because that is insufficient under Sixth Circuit precedent, their claim should be dismissed.  *CommonSpirit*, 37 F.4th at 1167; *Forman*, 40 F.4th at 449.

## II.   Plaintiffs' Excessive-RKA-Fee Claim in Count I Should Be Dismissed.

### A.   Plaintiffs' Fee Comparisons Do Not Support an Inference That AB Lacked a Prudent Fiduciary Process

Plaintiffs' only remaining claim is that the Plan's RKA expenses were purportedly larger

---

[15] Ex. 2, FMIP Fact Sheet (Sept. 30, 2023), at 1.

[16] Ex. 6, T. Rowe Price Stable Value Fund (Sept. 30, 2023).

than those of six other plans in a single year (2018).  *See* Am. Compl. ¶¶ 53-82, 96-153.[17]  Courts in the Sixth Circuit have repeatedly rejected precisely this sort of claim.[18]  Dismissal is especially warranted here because the Amended Complaint provides an even narrower basis for inferring imprudence than the original Complaint and others dismissed by courts in this Circuit.  After Defendants demonstrated Plaintiffs' original 17 comparator plans were inapt and uninformative, the Amended Complaint jettisoned all but five (while adding a single new one), leaving only six comparators in total.  In other words, Plaintiffs have conceded that 12 of the 18 total comparators identified between their two complaints *do not support* their claims.

Even assuming similarity, the six that remain cannot support an imprudence claim.  There are thousands of plans in the marketplace, so an allegation that the Plan paid more than six others in 2018 alone says nothing about the reasonableness of the fees paid for the specific services the Plan received, let alone the process the Committee used to evaluate them.  Any enterprising lawyer could challenge the fees paid by almost any 401(k) plan by scouring the market and Form 5500 filings to identify others that apparently paid less at some point—especially when they can later amend the complaint to eliminate comparators shown to undermine their claim.  This is why Rule 12(b)(6) is such an "important mechanism" for "weeding out" meritless ERISA claims, which seek to make ERISA fiduciaries an easy target for class-action litigation and outsized settlements.  *See Dudenhoeffer*, 573 U.S. at 425; *CommonSpirit*, 37 F.4th at 1164-65.

---

[17] Plaintiffs' conclusory allegation that Defendants did not "solicit quotes and/or competitive bids from recordkeepers" (Am. Compl. ¶ 98) is irrelevant to whether they have stated a plausible claim of imprudence. As another district court in the Sixth Circuit recently put it, "ERISA does not require plan fiduciaries to obtain competitive bids from plan service providers." *Miller*, 2023 WL 2705818, at *7 (quoting *Ferguson v. Ruane Cunniff & Goldfarb Inc*., 2019 WL 4466714, at *8 (S.D.N.Y. Sept. 18, 2019)); *Matney v. Barrick Gold of N. Am.*, 80 F.4th 1136, 1156 (10th Cir. 2023) ("Simply alleging the [defendant] needed to conduct regular RFPs does not raise a plausible inference of imprudence").

[18] *See supra* at 1 n.1 (collecting cases).

The meaningless nature of Plaintiffs' comparisons is compounded by Plaintiffs' choice to use comparative data for only a single year (2018).  Given the potential for variation in RKA fees from year to year, courts have found that selective, single-year comparisons of this kind are insufficient to state a plausible claim, particularly one that extends over a multi-year period.  *See, e.g., DENSO*, 2023 WL 4851878, at *4 n.7 (rejecting fee comparisons based on a "single year" of comparative data); *Mateya*, 2023 WL 4608536, at *8 (same); *Jones v. Dish Network Corp.*, 2023 WL 2644081, at *5 (D. Colo. Mar. 27, 2023) (same).  For good reason:  A single year of incomplete fee data from a statistically insignificant set of "comparators," without more, cannot support any reasonable inference that a plan's fiduciaries failed to prudently evaluate RKA fees over the course of more than six years.  *See Mateya*, 2023 WL 4608536, at *8.  That is particularly true where, as here, twice as many so-called "comparators" have been abandoned by Plaintiffs because they undermine rather than support their "excessive" fee allegations.

### B.  Plaintiffs' Fee Comparisons Fail Because They Do Not Account for Differing Types and Levels of Service Provided by Plan Recordkeepers.

Plaintiffs' claim fails because the plans listed by Plaintiffs are not comparable, as they provide varying levels and types of services to their participants, at variable costs.  To state a claim, the Sixth Circuit, like other circuits, requires Plaintiffs to plausibly allege that the RKA services the Plan received "are equivalent to those provided" to Plaintiffs' alleged comparator plans.  *CommonSpirit*, 37 F.4th at 1169 (quoting *Young v. Gen. Motors Inv. Mgmt. Corp.*, 325 F. App'x 31, 33 (2d Cir. 2009)); *Matousek v. MidAm. Energy Co.*, 51 F.4th 274, 279-80 (8th Cir. 2022) (similar); *Albert v. Oshkosh Corp.*, 47 F.4th 570, 579 (7th Cir. 2022), *reh'g denied*, 2022 WL 4372363 (7th Cir. Sep. 21, 2022) (similar); *Matney*, 80 F.4th at 1157 (similar).[19]  Without such

---

[19] District courts also routinely reject allegations that only compare prices, without a meaningful description of the services provided, between the challenged plan and the complaint's comparators.  *See, e.g.*, *Mateya*, 2023 WL 4608536, at * 3 (collecting cases); *Riley v. Olin Corp.*, 2022 WL 2208953, at *4 (E.D. Mo. June

allegations, a complaint "does not provide the kind of context that could move [the] claim from possibility to plausibility." *Oshkosh*, 47 F.4th at 580 (citation omitted).

Here, the Amended Complaint alleges nothing of the kind.  Instead, it alleges only that "RKA services are commoditized" and "essentially fungible," so the services *available* to all large retirement plans are "materially identical."  Am. Compl. ¶¶ 62-63, 89, 104.  However, alleging that all recordkeepers *can* provide the same services is a far cry from alleging that each comparator plan *selected* the same services as the AB Plan.  Indeed, courts in the Sixth Circuit have repeatedly rejected allegations that all "mega" plans receive the same "essentially fungible" RKA services.  For example, in *Miller*, the court dismissed materially identical RKA-fee claims because the complaint "provide[d] no facts to support [the plaintiff's] contention that the RKA services provided to mega plans are generally the same, or that the recordkeepers in his chart provided essentially the same services as [the challenged plan]."  2023 WL 2705818, at *5; *see also DENSO*, 2023 WL 4851878, at *3 (same); *Kroger*, 2023 WL 2431667, at *9 (same).  In short, Plaintiffs rely on the same allegations made by the same lawyers who filed the same complaints that were dismissed in the above cases, and thus the same result is appropriate here too.

Moreover, the Form 5500 documents on which the Amended Complaint relies reveal that its comparator plans selected different RKA services.  The Forms 5500 contain "service codes" reflecting the specific categories of services for which the plan's recordkeeper was paid during the relevant year.  Here, the comparator plans' Forms 5500 show that "[t]hose [service] codes vary from plan to plan, with some plans listing more codes than others, suggesting that the particular

21, 2022) ("[P]laintiff must plead that the administrative fees are excessive in relation to the specific services the recordkeeper provided to the specific plan at issue.") (internal quotation marks and citation omitted); *Mator v. Wesco Distrib., Inc.*, 2022 WL 3566108, at *7 (W.D. Pa. Aug. 18, 2022), *appeal filed*, No. 22-2552 (3d Cir. Aug. 23, 2022) (same); *Perkins v. United Surgical Partners Int'l Inc.*, 2022 WL 824839, at *6 (N.D. Tex. Mar. 18, 2022) (same); *White v. Chevron Corp.*, 2016 WL 4502808, at *14 (N.D. Cal. Aug. 29, 2016) (same); *Goldenberg v. Indel, Inc.*, 741 F. Supp. 2d 618, 631 (D.N.J. 2010) (same).

services provided by the recordkeepers were not all the same; rather, they varied by type and/or quantity." *Miller*, 2023 WL 2705818, at *5.  For example, in 2018, the AB Plan's Form 5500 indicates Fidelity provided five categories of services: trustee services (Code 25), participant loan processing (Code 37), recordkeeping services (Code 64), account maintenance (Code 65), and securities brokerage services (Code 71).[20]  In contrast, the Form 5500 for the Pilgrim's Pride Plan show that plan's recordkeepers provided just one category of services (Code 64).[21]  Thus, as in other cases rejecting similar RKA-fee claims, variations in publicly reported services among Plaintiffs' comparator plans confirm the implausibility of Plaintiffs' allegation that the RKA services the AB Plan received are necessarily equivalent to those received by their alleged comparator plans.  *See Miller*, 2023 WL 2705818, at *5-6; *Kroger*, 2023 WL 2431667, at *9; *DENSO*, 2023 WL 4851878, at *4 (same); *Probst*, 2023 WL 1782611, at *11.

By the same token, the variation in reported services demonstrates the implausibility of Plaintiffs' related assertion that any differences in RKA services from one plan to the other have no material impact on total RKA expenses.  Am. Compl. ¶ 60.  Not only did the comparator plans report varying RKA services in their Forms 5500, but Plaintiffs' own chart (Am. Compl. ¶ 103) indicates those same plans reported paying widely varying direct fees (excluding indirect fees) of $23 to $35 per participant.  As the court recently explained in *Kroger*, these material "differences in costs and the differences in services reported among the comparable plans suggest that even minor variations in services impact per participant [RKA] fees."  *Kroger*, 2023 WL 2431667, at *9; *see also* DOL, *A Look at 401(k) Plan Fees*, at 3 (Sept. 2019) ("generally the more services

---

[20] Ex. 1, Excerpts from AB Plan 2018 Form 5500, Sch. C, at 3.

[21] Ex. 7, Excerpts from Pilgrim's Pride Retirement Savings Plan 2018 Form 5500, Sch. C, at 3.

provided, the higher the fees").[22]

Apparently recognizing these problems, Plaintiffs argue that a stipulation Fidelity signed in another lawsuit confirms the universal "value" of Fidelity recordkeeping services is just $14 to $21 per participant. Am. Compl. ¶¶ 77-79. Plaintiffs emphasize that, in the stipulation, Fidelity represented that the above range applied to the value of recordkeeping services Fidelity provided to its *own* 401(k) plan and that Fidelity's own plan "did not receive any broader or more valuable recordkeeping services from Fidelity than the services received by any other Fidelity-recordkept plan with at least $1 billion in assets[.]" *Id.* ¶ 78. From there, Plaintiffs argue that this means the "[AB] Plan did not receive any broader or more valuable recordkeeping services . . . than . . . any other Fidelity-recordkept plan with at least $1 billion in assets during the Class Period." *Id.* ¶ 79. This argument fails on every level.

First, Plaintiffs' interpretation of the Fidelity stipulation makes no sense. The stipulation states that the *Fidelity plan* received no "broader or more valuable" services than any other Fidelity-recordkept plan; it does not state the opposite. That is, the stipulation does not state that other plans did *not* receive "broader or more valuable services" than those received by the Fidelity plan. Thus, Fidelity's statement that its own plan received "no broader or more valuable" services than other plans means that other plans may well have received *broader or more valuable* services than those the Fidelity plan received. And it certainly does not mean, as Plaintiffs contend, the AB Plan received the *same* services as *all* other Fidelity-recordkept plans.

Second, Plaintiffs ignore that Fidelity has since clarified the stipulation. More than two years ago, Fidelity filed a brief explaining that the stipulation above "does not reflect the value of

---

[22] The cited DOL article is available at https://www.dol.gov/sites/dolgov/files/ebsa/about-ebsa/our-activities/resource-center/publications/a-look-at-401k-plan-fees.pdf (last viewed Nov. 20, 2023).

the recordkeeping services that Fidelity provides to *different plans* pursuant to *different recordkeeping contracts* for a *different set of services.*" *Harmon v. Shell Oil Co.*, No. 3:20-cv-0021, Dkt. 134 (S.D. Tex. Mar. 1, 2021). Unsurprisingly, then, courts have rejected identical arguments that the Fidelity stipulation supports excessive-RKA-fee claims, because it "does not explain which recordkeeping services could be purchased at between $14-$21, nor does [it] clarify which services [other plans] purchased." *Mateya*, 2023 WL 4608536, at *6; *Wehner v. Genentech, Inc.*, 2021 WL 507599, at *6 (N.D. Cal. Feb. 9, 2021) (same); *Fritton v. Taylor Corp.*, 2022 WL 17584416, at *8 (D. Minn. Dec. 12, 2022) (same). Simply put, the Fidelity stipulation cannot save Plaintiffs' claims from dismissal.

### C.   Plaintiffs' Fee-Comparison Allegations Fail Because They Do Not Accurately Calculate the Total Fees Paid by the Comparator Plans.

Even beyond the problems above, Plaintiffs' fee comparisons fail to support any plausible inference of imprudence because they selectively discount the total fees paid in relation to their comparator plans in at least three ways.

**First**, all but one of Plaintiffs' comparator plans disclose in the same Forms 5500 on which Plaintiffs rely that the employer who sponsors the plans paid a portion of the plans' RKA fees. For example, the Form 5500 for the FedEx plan states "[t]he Company pays all administrative expenses of the Plan," with a few exceptions related to participant-transaction fees.[23] Similarly, the Form 5500 for the Michelin plan states "the majority of the Plan's administrative expenses are paid by the Company."[24] The same is true of the JBS, Pilgrim, and Genesis plans.[25] These

---

[23] Ex. 8, Excerpts from FedEx Office and Print Services, Inc. 401(k) Retirement Savings Plan 2018 Form 5500, Fin. Stmts., at 7.

[24] Ex. 9, Excerpts from Michelin 401(k) Savings Plan 2018 Form 5500, Fin. Stmts., at 10.

[25] Ex. 10, Excerpts from JBS 401(k) Savings Plan 2018 Form 5500, Fin. Stmts., at 7 ("certain recordkeeping expenses paid by the plan"); Ex. 7, Excerpts from Pilgrim's Pride Retirement Savings Plan 2018 Form 5500, Fin. Stmts., at 8 ("certain recordkeeping expenses paid by the plan"); Ex. 11, Excerpts from Genesis

disclosures are critically important because, when it comes to RKA fees, Forms 5500 report only 8the "direct compensation *paid by the plan*," *see e.g.*, Ex. 11, Excerpt from Genesis Healthcare 401(k) Plan 2018 Form 5500, Sch. C, at 3 (emphasis added), and *not* any additional amounts paid by the employer. Because Plaintiffs only count the former and not the latter, they have necessarily understated the total fees paid for the RKA services their comparator plans received. At the very least, they have not plausibly alleged the *total* fees paid for those services, and thus their allegation that the AB Plan overpaid by comparison is implausible, too.

**Second**, recordkeepers may collect their fees through direct plan charges, indirect plan charges, or a combination of both: (1) "direct compensation paid to each plan's recordkeeper directly," or (2) "indirect compensation" such as "revenue sharing" from plan investment options. Am Compl. ¶¶ 73, 81, 93. However, despite acknowledging that both types of payments must be considered, the Amended Complaint largely ignores the indirect compensation received by the comparator plans' recordkeepers. According to their Forms 5500, all six comparator plans paid both direct and indirect fees.[26] Yet for some of those plans, the Amended Complaint blithely alleges the recordkeepers received none. *See* Am. Compl. ¶¶ 118, 121, 130. The Court should reject these allegations because they contradict the same Forms 5500 on which Plaintiffs rely. *See, e.g.*, *Miller*, 2023 WL 2705818, at *6 (dismissing complaint that failed to account for "the amount of that indirect compensation" paid to comparator-plans' recordkeepers); *Mateya*, 2023 WL 4608536, at *8 (same); *Singh v. Deloitte LLP*, 650 F. Supp. 3d 259, 267 (S.D.N.Y. 2023) (same).

Further, while Plaintiffs attempt to calculate the total direct and indirect compensation paid to some comparator plan recordkeepers, the calculations make no sense. Plaintiffs allege, for

---

Healthcare 401(k) Plan 2018 Form 5500, Fin. Stmts., at 8 ("Certain expenses incurred in the administration of the Plan are paid by the Company and some are paid by the Plan").

[26] *See* Exhibits 7 – 12, Sch. C, at 3.

example, that the Sanofi plan paid only $23 per participant in direct fees.  In fact, however, the

Form 5500 states that the Sanofi plan paid $1,082,552 in *direct* RKA fees, equal to nearly $45 per

participant, or nearly *double* the amount alleged.[27]   Plaintiffs try to justify this by alleging that

amount the plan paid in direct fees should be reduced because the Form 5500 elsewhere indicates

that around $500,000 of the total *indirect* compensation collected by the plan's recordkeeper was

returned to the plan.  Am. Compl. ¶ 131.   But direct and indirect compensation are two different

things, and so the fact that the recordkeeper returned some of the *indirect* compensation does not

reduce the total amount of the additional *direct* compensation also received.

**Third**, Plaintiffs' inclusion of "a la carte" and "ad hoc" fees in the Plan's "Total RKA

Fees" amount renders their calculations meaningless.  As the Amended Complaint explains, "a la

carte" services often have "separate, additional fees based on the conduct of individual participants

and the usage of the service by individual participants."  Am. Compl. ¶ 66.   These services can

include "loan processing, brokerage services/account maintenance, distribution services, and

processing of Qualified Domestic Relations Orders (QDROs)."  *Id.*  Thus, a plan's "a la carte" fees

will be higher or lower depending, for example, on how many participants elect to take out plan

loans or receive distributions.  The same is true of "ad hoc" services.  *See id.* ¶ 68.  Accordingly,

without knowing the relative proportion of a plan's total fees attributable to participant-elected "a

la carte" or "ad hoc" services—facts alleged nowhere in the Amended Complaint—it is impossible

to meaningfully compare the Plan's total fees to those of Plaintiffs' comparators.[28]  *See Matousek*,

---

[27] *See* Ex. 12, Excerpts from Sanofi U.S. Group Savings Plan 2018 Form 5500, at 2 (24,097 participants with balances at end of plan year), Sch. C, at 3 (direct fees of $1,082,552 paid to recordkeeper).

[28] An example helps illustrate the point.  Consider two plans with exactly 10,000 participants that each pay exactly $36 per participant in combined direct and indirect fees for "bundled services," provided by Fidelity, but also pay $100 "a la carte" fees for each participant who takes out a loan.  In this scenario, the participants in both plans pay a total of $360,000 for "bundled" services.  However, if the participants in one plan took out 2,500 loans during the year, they would pay an additional $250,000 in fees ($610,000 in total), while the participants in the other plan who took out just 500 loans that year would pay only $50,000 in additional

51 F.4th at 280 (without knowing the proportion of "fees arising out of participant-initiated transactions like 'loans' and 'distributions'" there can be no meaningful comparison).

## III.     Plaintiffs' Derivative Claims in Counts III and IV Should Be Dismissed.

In Counts III and IV, Plaintiffs allege that AB and its Board of Directors failed to prudently monitor the Committee, and therefore are derivatively liable for the Plan's allegedly excessive RKA fees. Am. Compl. ¶¶ 221-34.  As a matter of law, however, these claims can survive only if Plaintiffs' predicate claim in Counts I and II are plausible.  For the reasons discussed above, therefore, Plaintiffs' derivative claims in Counts III and IV should be dismissed. *See Miller*, 2023 WL 2705818, at *12; *see also Saumer v. Cliffs Nat. Res. Inc.*, 2016 WL 8668509, at *8 (N.D. Ohio Apr. 1, 2016), *aff'd*, 853 F.3d 855, 865 (6th Cir. 2017).

Plaintiffs' failure-to-monitor claims are also deficient on their own terms because they rest entirely on legal conclusions, without any factual allegations about AB's or the Board's process for monitoring the Committee, or how that process was deficient. *See, e.g.*, *Harmon v. FMC Corp*., 2018 WL 1366621, at *5 (E.D. Pa. Mar. 16, 2018) (explaining that such a claim "falls short" where it "offers no direct allegations of flaws in [d]efendants' process"); *Nicolas v. Trs. of Princeton Univ.*, 2017 WL 4455897, at *5 (D.N.J. Sept. 25, 2017) (similar); *Romero v. Nokia, Inc*., 2013 WL 5692324, at *5 (N.D. Cal. Oct. 15, 2013) (similar).

## CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court dismiss the Complaint in its entirety and with prejudice, under Rule 12(b)(6).

---

fees ($410,000 in total).  Simply dividing the total RKA fees paid by total participants would suggest that the plan whose participants took out 2,500 loans during the year paid $61 per participant, while the participants in the second plan who took out fewer loans paid just $41 per participant.  Under Plaintiffs' flawed methodology, this result would illogically suggest that the plan whose participants elected to take out more loans necessarily paid "unreasonable" RKA fees—an extra ***$20 per participant***—even though both plans had the ***exact same*** fee arrangement.

Respectfully submitted,


/s/ Christopher B. Boran

Christopher B. Boran (admitted *pro hac vice*)
Christopher B. Dempsey (admitted *pro hac vice*)
Morgan, Lewis & Bockius LLP
110 North Wacker Drive, Suite 2800
Chicago, IL  60606
(312) 324-1000
christopher.boran@morganlewis.com
chris.dempsey@morganlewis.com

Jared R. Killeen (admitted *pro hac vice*)
Morgan, Lewis & Bockius LLP
1701 Market Street
Philadelphia, PA  19103
(215) 963-5000
jared.killeen@morganlewis.com

Michael W. Hawkins
Alina Klimkina
Dinsmore & Shohl LLP
101 South Fifth Street
Suite 2500
Louisville, KY  40202
(502) 540-2300
michael.hawkins@dinsmore.com
alina.klimkina@dinsmore.com

ATTORNEYS FOR DEFENDANTS

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a copy of the foregoing has been filed electronically on the 20th day of November 2023.  Notice of this filing will be sent to the following parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's electronic filing system.

*/s/ Christopher Boran*
Attorney for Defendants